**MCI TELECOMMUNICATIONS, INC.**

v.

**T.A. COMMUNICATIONS, INC., et al.**

No. Civ. L–90–3117.

United States District Court,
D. Maryland.

March 22, 1999.

James D. Mathias, and Stacie Eileen Tobin, of Baltimore, Maryland, for plaintiff/counter-defendant.

Gerald J. Emig, Christopher C. Fogleman, Laurie Hanig, and Gleason, Flynn and Emig, Chartered, of Rockville, Maryland, for defendants/counter-plaintiffs Theodore Allen Communications, Inc., Theodore Graham, and Allen R. Samuel.

Carl A.S. Coan, III, of Washington, D.C., for defendant/counter-plaintiff Allen R. Samuel.

## MEMORANDUM

LEGG, District Judge.

This case, which was filed in November 1990, began as a simple contract action. MCI Telecommunications, Inc., ("MCI") brought suit against T.A. Communications, Inc. ("TAC") and two of its principals to recover approximately $81,000 in unpaid bills for telecommunications services. TAC filed a counterclaim charging that MCI had violated the federal Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.* ("the Communications Act"), and Mary-

land common law. According to TAC, the way in which MCI serviced TAC's MCI account led to the failure of TAC as business venture.

Eight years later, this case is again before the Court after an extended hiatus. In 1993, the Court closed the case for the purpose of making a primary jurisdiction referral to the Federal Communications Commission ("FCC"). Pursuant to the Court's Order, in August 1993, TAC filed an administrative complaint with the FCC alleging that MCI had violated the Communications Act.

On May 22, 1997 the FCC issued its ruling. As explained in more detail herein, the FCC found that MCI's interpretation of the tariff governing its provisions of service to TAC constituted an unreasonable business practice under the Communications Act. *See* 47 U.S.C. § 201(b). The FCC returned the matter to this Court for determination of the proper remedies. TAC sought to have the administrative stay in this case lifted. The Court reopened the case and held a status conference with the parties to discuss the future course of this litigation.

The parties disagree over the effect of the FCC ruling. MCI argues that the only issue properly before this Court is the determination of damages suffered by TAC as a result of MCI's violation of the Communication Act. According to MCI, the FCC resolved all liability issues related to the Communications Act, leaving only the determination of damages. The state law claims included in the Counterclaim, MCI argues, are preempted by the Communications Act. As such, it has filed a Second (Partial) Motion to Dismiss Counterclaim, which is now before the Court.[1]

TAC views the FCC ruling differently. TAC argues that the FCC only dealt with certain aspects of its counterclaim, meaning this Court must still resolve certain of its federal claims and all of the state law allegations. As explained herein, the Court finds that the Communications Act violations have been conclusively dealt with by the FCC, but not all of the state law claims are preempted by the federal regulatory scheme. Accordingly, MCI's Motion to Dismiss will be, by separate Order, GRANTED IN PART AND DENIED IN PART.

## I. Background

Defendants Theodore L. Graham and Allen R. Samuel formed TAC in late 1988 to provide long distance service to business and residential customers. TAC operated as a "switchless rebiller."[2] It did not own any telecommunications equipment, but rather purchased large amounts of service from long-distance carriers like MCI for resale to individual customers. TAC solicited clients for their service and billed them individually based on records provided by MCI. By purchasing long distance service through TAC, rather than directly from MCI, individual customers could receive volume discounts for which they would not normally qualify. TAC profited from this arrangement by passing through most, but not all, of the volume discount obtained from MCI through to its customers. Understandably, MCI disliked dealing with "switchless resellers," who could lure profitable customers away from MCI.[3]

1. MCI had filed an earlier Motion to Dismiss before the case was closed prior to the primary jurisdiction referral. The Court will consider both motions at the present time.

2. This type of operation is also described as a "reseller" or "aggregator."

3. The practice is legal, however, and the FCC has required that long-distance companies make their facilities available to aggregators such as TAC. *See In the Matter of Regulatory*

*Policies Concerning Resale and Shared Use of Common Carrier Domestic Public Switched Network Services,* 83 F.C.C.2d 167 (1980). There has been considerable litigation between aggregators and long-distance providers. *See e.g. AT & T v. Central Office Telephone, Inc.,* 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998); *Cooperative Communications, Inc., v. AT & T Corp.,* 867 F.Supp. 1511 (D.Utah 1994); and *National Communica-*

TAC and MCI entered into a service agreement on June 14, 1989. TAC enrolled for MCI's Prism Plus service, which carried a 4% discount from MCI's standard rates. TAC alleges that it was told that it would be eligible for a 20% discount once "the total traffic of all of TAC's customers reached the level of $2,500 per month." (*See* TAC's FCC Complaint ¶ 18.) The higher level of discount was known as the Corporate Account Service discount ("CAS"). TAC soon achieved total aggregated monthly billings of more than $2,500, but was denied the CAS discount by MCI. MCI claimed that the CAS tariff did not allow aggregation of separate accounts not owned by the MCI account holder. For example, a corporation could combine the accounts of its various sales offices, which were each owned or leased by the corporation, but an umbrella organization, whose only relationship to the various locations provided long-distance service was the long-distance contract itself, would not qualify under the tariff. TAC claims that it had clearly explained the nature of its business to MCI representatives before signing the June 14 contract.

After further discussion throughout the fall of 1989, MCI offered TAC a new discount plan in December 1989. According to TAC, MCI informed TAC that if it could achieve monthly billings of $30,000, MCI would enroll TAC in the VNET program. VNET entailed even larger discounts than the CAS discount earlier promised TAC. After TAC sought to expand its billing to meet this new threshold, MCI again informed TAC that it did not qualify for the discount program. The basis for both denials was that each TAC account must exceed the minimum threshold for the discount, as opposed to TAC's overall monthly billings from MCI.

TAC never received the discounted rates on which its business plan was based. In May 1990, TAC went out of business without paying its outstanding account balance with MCI. MCI filed the present suit in November 1990 to recover $81,599.61 in unpaid bills for service rendered to TAC. The suit named TAC and its two principals, Graham and Allen, who had executed personal guarantees.

After some procedural skirmishing, TAC filed a six count counterclaim. Counts one and two allege breach of contract, based on MCI's failure to grant the CAS and VNET discounts. Count three alleges that MCI breached its duty of good faith in administering its contractual relationship with TAC. Count four alleges negligence on the part of MCI. Count five claims MCI fraudulently induced TAC to continue doing business with MCI, although MCI never intended to grant TAC the CAS or VNET discounts. Finally, count six charges MCI with myriad violations of the Communications Act.

As previously stated, this Court administratively closed this case in 1993, with the intent that the parties refer the Communications Act violations contained in count VI of the counterclaim to the FCC. The FCC has since issued its ruling. *See Theodore Allen Communications v. MCI Telecommunications Corp.,* 12 F.C.C.R. 6623 (1997) (the "FCC Order"). The case is, therefore, now again properly before this Court, in the form of the defendant's Partial Motion to Dismiss.

## II. Discussion

### A. *Motion to Dismiss Standard*

Ordinarily, a Complaint should not be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim which entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Labram v. Havel,* 43 F.3d 918, 920 (4th Cir.1995). The liberal pleading requirements of Rule 8(a) demand only a "short and plain" statement of the claim. In evaluating such a

*tions Assoc. Inc. v. AT. & T,* 46 F.3d 220 (2d Cir.1995).

claim, the Court must accept as true all well-pleaded allegations of fact and view them in the light most favorable to the plaintiff. *See Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). In essence, the legal theory articulated, or even suggested, by the non-moving party must be one that could not be the basis for a ruling in that party's favor. In the present case, MCI does not dispute some liability to TAC on the federal claim, but argues that the remaining causes of action brought by TAC are preempted by either the FCC Order or the Communications Act, and, therefore, must be dismissed as a matter of law.

The present Motion requires the Court to resolve two issues. The first involves the effect of a primary jurisdiction referral upon the initial district court proceeding. The FCC Order decided certain of TAC's claims and held others "in abeyance." The Court must determine which claims asserted by TAC in the counterclaim are still properly before the Court following the FCC ruling.

The second major issue is to what extent the Communications Act preempts state common law claims arising from disputes over telephone service. Under the primary jurisdiction referral, the FCC had jurisdiction to consider TAC's allegations that MCI had violated the Communications Act, but not its state law causes of action. This Court must determine wheth-

er either the Act in general or the recent FCC decision preempts the common law claims. These two issues, the present status of (i) the Communications Act claims and (ii) the state common law claims, will be addressed in turn.

### B. Alleged Violations of the Federal Communications Act

Count VI of TAC's counterclaim alleges violations of the Federal Communications Act of 1934. In April 1993, Chief Judge Motz of this Court instructed TAC to submit to the FCC its claim that MCI had violated the Communications Act. In his Order, Chief Judge Motz determined that the FCC, as a specialized administrative body, had primary jurisdiction over the FCC claims.[4] The present case was stayed while TAC filed a complaint with the FCC.[5]

In its Amended FCC Complaint, filed August 13, 1993, TAC identified and pled six separate violations of the Act. The violations charged were as follows:

> Count 1—violation of 47 U.S.C. § 201(b) through MCI's refusal to give TAC the CAS and VNET volume discounts provided for by its tariff. Section 201(b) makes unlawful all "unjust or unreasonable" charges, practices, classifications, and regulations relating to communications services.

**4.** The Supreme Court has explained primary jurisdiction as follows:

> The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties ... Primary jurisdiction ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956).

**5.** Not all cases involving questions under the Communications Act are appropriate for primary jurisdiction. In *National Communications Assn. v. AT & T,* 46 F.3d 220 (2d Cir. 1995), the Second Circuit reversed the district court's decision to refer a similar dispute between a reseller and a long distance carrier to the FCC. The Second Circuit drew a distinction between cases "involving the enforcement of a tariff, as opposed to a challenge to the reasonableness of a tariff." *Id.* at 223. The first type should be decided by the district court, while cases involving the reasonableness of a tariff or "tariff interpretations" should be referred to the FCC.

Count 2—violation of Section 202(a), which prohibits rate discrimination among similarly situated entities. TAC alleged that other resellers where granted the discounts denied TAC.

Count 3—violation of Section 203(c), which prohibits a common carrier from charging rates different than those specified by the applicable tariff.

Count 4—violation of Section 201(b) (unreasonable business practices), based on MCI's alleged failure to deliver invoices in a timely manner.

Count 5—violation of Section 201(b) (unreasonable business practices), based on MCI's alleged double billing of customers it knew were being billed through TAC.

Count 6—violation of Section 201(b) (unreasonable business practices), based on the misrepresentations by MCI's agents as to the terms of the applicable tariff.

As the above description demonstrates, TAC's administrative complaint included all of MCI's alleged misconduct pled by TAC in its common law causes of action. While the FCC did not have jurisdiction to rule on the state tort and contract claims, the conduct underlying those claims was presented to the Commission.

The FCC conducted a full adjudicatory proceeding. Discovery was conducted and the parties filed two rounds of briefs. In May 1997, the FCC issued its ruling. The decision follows a convoluted procedural path, but the Commission ultimately found that MCI had committed one of the alleged Section 201(b) violations and denied the remaining claims.

The exact disposition of the claims was as follows. After an initial status conference, the FCC decided not to pursue the allegations made in counts two, four, and six. The FCC found that those claims either "lacked a minimum of factual support, had been mooted, or were tangential to TAC's central contention in Counts 1 and 3 . . . ." *See* FCC Order at ¶ 7.

The FCC instructed TAC to submit additional materials on the allegations of double billing made in count five. TAC substantiated four incidents where MCI sent bills directly to customers served (and billed) by TAC. TAC requested extensive discovery to determine if the practice extended beyond these four examples. The FCC found that

the allegations lack[ed] a minimum of factual support sufficient to justify the extended discovery requested, particularly in light of our ultimate conclusions as to counts 1 and 3 . . . which effectively grant the relief requested in the other main counts.

*See* FCC Order at ¶ 15. Accordingly, the FCC rejected out of hand counts two, four, five and six of the FCC complaint.

Counts one and three of the FCC complaint received a more thorough discussion by the Commission. These counts address, on the basis of mutually exclusive legal theories, the issue of whether TAC should have received the promised discounts. Count one coupled the arguments that (i) TAC qualified for the discounts under an acceptable reading of the tariff, and (ii) MCI's refusal to adopt the reading favorable to TAC and grant the discounts was an unreasonable business practice. Count three charged that MCI refused to charge TAC the discounted price, to which TAC was clearly entitled under the tariff. The alleged variation from the terms of the tariff would constitute a violation of section 203(c).

The FCC found that the provisions of MCI's tariff governing eligibility for the volume discount were ambiguous. In its dealings with TAC, MCI construed this ambiguity against TAC and denied TAC the discounted rates. According to FCC precedent, "if there is ambiguity in tariffs they should be construed against the framer and favorably to users." *See* FCC Order at ¶ 22 (citing *Associated Press,* 72 F.C.C.2d 760, 764–65 (1979)). Accordingly, the FCC found that MCI's refusal to grant the discounts constituted an "unjust

and unreasonable practice within the meaning of Section 201(b) of the Act." *See* FCC Order at ¶ 26.

The FCC rejected the companion claim made in count three, that MCI had charged rates that varied from those specified in its tariff. To the extent that the tariff was ambiguous, MCI could not, by adopting one of two possible readings, be held to have charged a rate other than the one specified by its tariff. The Commission further noted that "it is unnecessary for the complainants to file a supplemental complaint for damages because their remedies are a matter for the United States District Court for the District of Maryland...." *See* FCC Order at ¶ 27, n. 62.

■ This Court finds that the FCC's determination of the issues arising under the Communications Act are conclusive of all the issues raised in count VI of TAC's counterclaim. The FCC had jurisdiction over and the opportunity to review all six counts TAC made in its FCC Complaint. While the FCC did not exhaustively examine and rule on each of TAC's claims, the agency, using its specialized expertise, reviewed the complaint as a whole and issued a final order. As stated in the FCC order, the Commission found that "the complaint should ... be granted in part as to the violation of Section 201(b), and otherwise denied in part as to the remaining allegations." *See* FCC Order at ¶ 1.

■ Having previously ceded jurisdiction to the FCC to determine the validity of TAC's federal claims, this Court is no longer free to substitute its judgment for that of the Commission. *See Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 69, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970). By statute, FCC orders may only be appealed in the Courts of Appeals, meaning this Court has no jurisdiction to review or modify the FCC's findings. *See* Administrative Orders Review Act, 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a). Neither party appealed the FCC order, and it has

now become a final decision no longer subject to review.

Accordingly, the Motion to Dismiss is granted with respect to count VI of TAC's counterclaim, with the exception of the section 201(b) violation found by the FCC. As directed in the accompanying Order, the Court shall hold a status conference to set a schedule for determining TAC's damages attributable to that violation.

## C. State Law Claims

Whether TAC may continue to litigate its state law claims presents a more difficult question. Counts I – V of TAC's counterclaim all allege violations of state common law. To the extent that these claims involve questions regulated by federal law, the causes of action may be preempted under the Supremacy Clause of the Constitution.

This complexity has been heightened by TAC's opportunity to litigate closely analogous federal claims in the FCC administrative proceeding. Even if the state claims are not *per se* preempted by the federal regulatory scheme, TAC may be precluded from raising certain claims in this forum because of collateral estoppel or related prudential doctrines.

### Federal Preemption

MCI has argued from the outset of this litigation that the Communications Act preempts all state law causes of action "concerning the duties, charges, and liabilities of ... telephone companies with respect to interstate communications." *See Ivy Broadcasting Co. v. AT & T*, 391 F.2d 486 (2d Cir.1968). If, as MCI argues, federal law has "occupied the field," then state law causes of action are barred in the interest of national uniformity.

■ This preemption can take several forms. To the extent that state statutes directly conflict with the federal regulatory scheme, the state laws are invalid. For example, a state law governing the technical aspects of interstate telecommunication

service would be preempted due to the conflicting federal regulations.

 State laws of general applicability, as opposed to statutes specifically dealing with a regulated industry, may also be preempted when they impact activities regulated by the federal government. This includes state common law causes of action. The filed rate doctrine presents a textbook example.

The Supreme Court has described the filed rate doctrine as follows:

the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

*Louisville & Nashville R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 59 L.Ed. 853 (1915). Restricting both parties to the rates set out in the tariff necessarily precludes a common law action to enforce a contract providing for a non-tariff rate.

 Accordingly, when dealing with rate disputes between a customer and a common carrier governed by the Communications Act "the general case law is that a regulated carrier must charge the tariff rate ..., even if it has quoted or charged a lower rate to its customer." *Marco Supply Company v. AT & T,* 875 F.2d 434 (4th Cir.1989); *Transportation Data Interchange v. AT & T Corp.,* 920 F.Supp. 86,

89 (D.Md.1996). "Even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff." *AT & T v. Central Office Telephone, Inc.,* 524 U.S. 214, 118 S.Ct. 1956, 1963, 141 L.Ed.2d 222 (1998) (citing *Kansas City Southern R. Co. v. Carl,* 227 U.S. 639, 653, 33 S.Ct. 391, 57 L.Ed. 683 (1913)).

 The area of federal preemption is bounded, however, by its underlying rationale, i.e. the need to effectuate an overall regulatory program. When faced with causes of action which do not challenge "practices expressly and exclusively regulated" by the Communications Act, courts have found them not to be preempted by federal law. *See Harrison Higgins, Inc. v. AT & T Communications,* 697 F.Supp. 220 (E.D.Va.1988); *Cooperative Communications, Inc. v. AT & T,* 867 F.Supp. 1511, 1515–17 (D.Utah 1994).[6]

In a concurring opinion in *Central Office Telephone, supra,* Chief Justice Rehnquist described the boundary at which the preemptive effect of the filed-rate doctrine ends:

the tariff does not govern, however, the entirety of the relationship between the common carrier and its customers. For example, it does not affect whatever duties state law might impose on petitioner to refrain from intentionally interfering with respondent's relationships with its customers.... The filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to is customers the services covered by the tariff. It does not serve as a shield against all actions based on state law.

*Central Office Telephone, Inc.,* 118 S.Ct. at 1966 (Rehnquist, C.J., concurring).[7]

**6.** *See generally In Re Long Distance Telecommunications Litigation,* 831 F.2d 627, 633–34 (6th Cir.1987); *Bruss Company v. Allnet Communication Services,* 606 F.Supp. 401, 409–11 (N.D.Ill.1985); *Corporate Housing Systems,*

*Inc. v. Cable & Wireless, Inc.,* 12 F.Supp.2d 688, 691–93 (N.D.Ohio 1998).

**7.** *Central Office* involved a similar dispute between a reseller and a long-distance carrier,

■ Accordingly, the Court must determine which of TAC's common law counts challenge "practices expressly and exclusively regulated" by the Act. Only those claims that infringe on the zone of federal exclusivity are barred by the preemption doctrine. The Court shall examine the five counts of the counterclaim in turn.

*Breach of Contract*

■ Counts I and II of the Counterclaim allege that MCI breached its service contracts with TAC. The alleged breaches are based on MCI's refusal to grant TAC the discounts originally promised to TAC by representatives of MCI. TAC brought identical claims in the FCC proceeding as count 1 of its administrative complaint. The FCC's discussion and resolution of count 1 (in favor of TAC) demonstrates that the interpretation of the CAS and VNET tariff provisions is unmistakably an issue dominated by federal law.

■ Had the FCC found that TAC's interpretation of the tariff was not valid under the Act, the filed-rate doctrine would have barred any breach of contract claims based on the refusal to grant the discounts. As decided by the FCC, MCI did not actually violate its tariff, but engaged in an unreasonable business practice by interpreting the tariff ambiguity against TAC. While the damages for this violation are yet to be determined, the issue of liability is governed by federal law and has been determined by the FCC.

Accordingly, the Court finds that counts I and II of TAC's counterclaim are preempted by the Communications Act and shall grant MCI's motion to dismiss as to those counts.[8]

*Negligence*

■ Count IV charges MCI with negligence "in the administration of its contractual relationship with TAC and in the administration of the accounts of TAC's customers." (*See* Counterclaim at ¶ 32). This cause of action is preempted both by the federal regulatory scheme and by contractual language in the applicable tariff. As part of its service agreement, MCI has disclaimed liability for negligence, a disclaimer which has been widely upheld as a necessary protection for those engaging in such a technical and complex business.

Furthermore, a detailed parsing of MCI's conduct to determine if it met the degree of care and skill which a reasonable long-distance telecommunications carrier would have exercised would draw this Court into territory more properly tread by the FCC.[9] As noted above, the FCC considered and rejected TAC's allegations of double-billing and delayed invoices in the context of an "unreasonable business practice." Accordingly, the Motion to Dismiss will be granted as to Count IV of the Counterclaim.

*Fraudulent Inducement*

■ The fraudulent inducement claim (count V) requires a different analysis. In

but with an important difference from case before this Court. The reseller sued AT & T for breach of contract and tortious interference with contractual relations under state law. The alleged contractual breaches by AT & T related, however, to special services and other options not included in or allowable under the applicable tariff. *See* 118 S.Ct. at 1963–64. The contractual provisions that AT & T allegedly violated, therefore, were presumptively illegal, under the filed rate doctrine, and could not be enforced through a lawsuit. *Id.* at 1965.

8. In count III of its counterclaim, TAC alleges that MCI breached its implied duty of good faith under the two service contracts. Under

Maryland law, "a duty of good faith and fair dealing is an implied term in certain contracts." *See Parker v. Columbia Bank*, 91 Md. App. 346, 604 A.2d 521, 531 (Md.App.1992). In the present circumstances, however, any such duty would clearly be preempted for the reasons stated above with respect to counts I and II. Accordingly, the motion to dismiss shall also be granted as to count III.

9. Ruling on the negligence count, unlike the intentional tort claims made in count V, would draw the court into the operations of the telecommunications industry. It is exactly that type of evaluation which Congress has left to the FCC and prohibited the states from undertaking.

this count, TAC does not allege that MCI breached any duty imposed by the Communications Act, the applicable tariff, or the service agreements between the parties. The tort claim does not, therefore, pose any interference to the uniform system of federal regulation. Rather, TAC charges MCI with deliberately and fraudulently sabotaging TAC's business prospects, a violation of Maryland common law.

Unlike the situations in *Marco Supply* and *Transportation Data, supra,* where the rate was simply misquoted, TAC alleges that MCI affirmatively denied it the, according to the FCC, proper rate from the applicable tariff. Furthermore, the Counterclaim contains allegations that the ambiguous tariff language was intentionally manipulated to hinder TAC. (*See* Counterclaim at ¶¶ 34–39).

It may be that count V is barred by the doctrine of res judicata. TAC included much of the conduct underlying its fraudulent inducement claim in its FCC complaint as an unreasonable business practices claim. Count six of the FCC complaint alleged that "the entire course of conduct of MCI mislead TAC into believing that [TAC qualified for the discounts]." (*See* FCC Complaint at ¶ 66). At this "early" stage of this eight year old litigation, however, the Court cannot determine that as a matter of law, TAC cannot make out an independent state law claim on these grounds. The Court also finds that the fraudulent inducement claim is not preempted by the federal regulatory scheme. Accordingly, MCI's Motion to Dismiss shall be denied with respect to Count V.

### III. Conclusion

For the reasons explained herein, MCI's motions to dismiss shall be granted as to counts I, II, III, and IV in their entirety. Count VI is dismissed except to the extent that it reflects the violation of 47 U.S.C. § 201(b) found by the FCC in the related administrative proceeding. The Motion to Dismiss is denied as to count V.

### *ORDER*

For the reasons stated in a Memorandum of even date, the Court hereby ORDERS that:

(i) the plaintiff's Motions to Dismiss (Dkt. Nos. 22 & 39) are GRANTED as to counts I, II, III, and IV of the defendant's counterclaim; those claims are hereby dismissed in their entirety; and

(ii) the Motions to Dismiss are DENIED with respect to count V of the counterclaim.

(iii) the Motions to Dismiss are GRANTED IN PART as to count VI of the counterclaim; count VI, except to the extent that it is based on the FCC's finding that MCI engaged in an unjust and unreasonable practice in violation of 47 U.S.C. § 201(b), is DISMISSED; and

(iv) the parties are directed to contact the Court within 15 days of the date of this Order to schedule a conference to discuss further proceedings in this matter.