**TELCO COMMUNICATIONS GROUP, INC., Plaintiff,**

v.

**RACE ROCK OF ORLANDO, L.L.C., Defendant.**

**No. CIV. A. 99–890–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

July 29, 1999.

---

Jonathan S. Gelber, Arlington, VA, for Plaintiff.

Tina Ruth Tyson, Bryan Cave, LLP, Washington, DC, for Defendant.

## MEMORANDUM OPINION

BRINKEMA, District Judge.

Before the Court is defendant's Motion to Dismiss this breach of contract action between a long-distance phone company and its customer. Plaintiff Telco Communications Group, Inc., ("Telco") is a Virginia corporation that provides long distance phone services. Defendant Race Rock of Orlando, L.L.C., ("Race Rock") is a Florida entity which uses plaintiff's long-distance services. The amount in controversy exceeds $75,000.

On May 20, 1997, Race Rock entered into a Service Order Form with Telco in which Race Rock ordered five telephone calling cards. According to Race Rock, upon receipt of Telco's January 1, 1999, invoice, Race Rock's Director of Finance and Administration, Larry Cate, realized that card # 9863959246BC had been stolen. The invoice included charges for over $92,000 in telephone calls to Iraq, Mexico, Pakistan, Vietnam and numerous places in Central and South America. Race Rock contends that no employee of Race Rock placed the calls or authorized anyone else to place those calls. The physical calling card was in the possession of Race Rock at all times and was destroyed after Race Rock received the invoice.

Upon receipt of the invoice, Cate informed Race Rock's long-distance broker, Mike McNally of TMA, Inc., who reported the unauthorized use to Telco. Cate and McNally had numerous conversations with Telco employees in January, February and March 1999, and Telco allegedly informed Cate that it was aware of fraudulent activity and that Telco understood that Race Rock employees did not make the calls. In March, Cate received a statement from Jeff Renner of Telco indicating that a balance was past due. Cate corresponded with Telco officials and was under the impression that Telco would not hold Race Rock liable for the unauthorized calls. However, on May 25, 1999, Telco informed Race Rock that the invoice was being turned over to an attorney for collection.

On June 22, 1999, Race Rock was served with Telco's Motion for Judgment, in which Telco claimed $92,721.29 [1] arising out of "a contractual relationship to have Plaintiff Telco supply long distance services." Motion for Judgment at ¶ 3. On June 24, 1999, defendant removed the Motion for Judgment to this Court.

Telco alleges that the agreement and relevant federal tariffs provide for liability for unpaid amounts, a 1.5% finance charge for late payments, and attorneys' fees.

### Analysis

Defendant Race Rock's Motion to Dismiss presents the novel question of whether a telephone calling card is covered by Regulation Z, the federal regulation that implements the Truth in Lending Act.[2] Within this regulation is a provision that caps liability for unauthorized use of credit cards at $50. *See* 12 C.F.R. § 226.12(b) (1999). Plaintiff maintains that Regulation Z does not govern the instant case because the telephone calling card provided to defendant is not a credit card and, moreover,

---

1. During oral argument, defendant presented evidence that it had paid $200 towards this invoice for $180 in charges it did not dispute and interest on that amount. This reduces the amount in dispute to $92,521.29.

2. The Truth in Lending Act is contained in title I of the Consumer Credit Protection Act, codified as amended in 15 U.S.C.A § 1601 *et seq.* (1998).

the parties' relationship is governed by contract and applicable tariffs.

Regulation Z promulgates liability caps for the unauthorized use of credit cards. Section 226.12 provides:

> (b) *Liability of a cardholder for unauthorized use—(1) Limitation on amount.* The liability of a cardholder for unauthorized use of a credit card shall not exceed the lesser of $50 or the amount of money, property, labor or services obtained by the unauthorized use before notification to the card issuer under paragraph (b)(3) of this section.

"Public utility credit" is normally exempt from the protections of Regulation Z, *see* § 226.3(c), and plaintiff argues that if a telephone calling card is deemed "public utility credit" it would not be covered by Regulation Z's liability caps for unauthorized use. Telephone credit would clearly qualify as public utility credit, which is defined in § 226.30 of Regulation Z as:

> An extension of credit that involves public utility services provided through pipe, wire, other connected facilities, or radio or similar transmission (including extensions of such facilities), if the charges for service, delayed payment, or any discounts for prompt payment are filed with or regulated by any government unit.

However, the Federal Reserve Board amended § 226.3 to extend the protections of Regulation Z to any credit card, even that which extends public utility credit:

> The provisions of § 226.12(a) and (b) governing the issuance of credit cards and the liability for their unauthorized use apply to all credit cards, even if the credit cards are issued for use in connection with extensions of credit that otherwise are exempt from this section.

§ 226.3 n. 4. Thus, if a telephone calling card involves "an extension of credit," it would be covered by Regulation Z, and the Motion to Dismiss would have to be granted.

### I. Does a telephone calling card extend credit?

Defendant relies on several sources of authority for its argument that telephone calling cards involve extensions of credit. First, the Federal Reserve Board clearly recognizes telephone calling cards as credit cards. The Final Rule amending 12 C.F.R. § 226.3 explains that "[t]he vast majority of credit cards that are affected by this amendment are telephone calling cards." Truth in Lending; Credit Cards; Issuance and Liability, 49 Fed.Reg. 46,989, 46,990 (1984). Moreover, as the Board of Governors of the Federal Reserve wrote in amending Regulation Z:

> The questions regarding the applicability of the credit card amendments to telephone cards take on particular importance because of the millions of telephone credit cards that have been issued in recent years ... [U]nless the credit card protections in Truth in Lending apply to these cards, it is unknown what policies will be set by these companies in the future. It is possible that the companies will reverse their past policies and seek to impose liability on the cardholder whose card is used for unauthorized calls.

*Id.* We view this language as strong evidence of the Federal Reserve's intent to bring telephone calling cards within the protections of Regulation Z.[3]

Plaintiff admits that it provided defendant with five wallet-sized cards that resemble credit cards. However, plaintiff argues that the calling card number printed on the card, coupled with a Personal

---

**3.** Race Rock also argues that it cannot be held liable even for $50 because Telco did not comply with 12 C.F.R. § 226.12(b)(2), which requires that the credit card issuer notify the user that his or her liability will not exceed $50 (or any lessor amount) for unauthorized use. According to Race Rock, Telco did not provide such notice, and, therefore, Race Rock cannot be liable for the $50. We agree that Telco has not complied with this regulation.

Identification Number (PIN), merely provides a method for accessing its public utility function from alternate sites and have no independent or potential credit function. Plaintiff relies on *Swift v. First USA Bank, et al.*, No. 98 C 8238, 1999 WL 350847 (N.D.Ill. May 21, 1999), which involved a telephone calling card with the ability to become a credit card after a single activation call. Such a card is sometimes referred to as a "dual purpose" card. Under the Truth in Lending Act, companies may not send unsolicited credit cards, but they may send unsolicited calling cards. *See* 15 U.S.C.A. § 1642 (1998). Swift sued First USA Bank, the marketing company, and the long distance company on the theory that they had sent an unsolicited credit card. The court granted the long-distance company's motion to dismiss, ruling that the long-distance provider did not extend consumer credit and was therefore not governed by the Truth in Lending Act. *See Swift*, 1999 WL 350847 at *4. Plaintiff argues that the Telco card is even less like a credit card than the card in *Swift* because the Telco card can never be used to access credit and has no magnetized strip.

Defendant distinguishes *Swift* by arguing that the court only granted the long-distance company's motion to dismiss because, under the specific credit arrangement at issue, only First USA was extending credit. The court noted that the plaintiff did not allege that either the telephone company or the marketing company "extends ... consumer credit or is 'the person to whom the debt ... is initially payable.'" *Swift*, 1999 WL 350847 at *4. Because the telephone company was not in the position of extending credit, and specifically because the customer did not write checks to the telephone company (but rather to the credit card company), the *Swift* court distinguished between a "credit" card and the calling card. However, in the instant case, Race Rock paid Telco directly, and Telco was the entity that was "extending credit." We agree

with defendant that the facts of our case render *Swift* inapplicable.

Plaintiff contends that its card is more akin to a membership card because it allows a user to consolidate all phone charges on a single invoice, no matter the calling location. The card can only be used to purchase telephone time, not other items normally bought with consumer credit. Further, the card exhibits no characteristics of a normal credit: there are no extended payment terms, partial payments, credit limits, or restrictions from certain merchants. Furthermore, according to Telco officials, the entire bill is due and payable in full upon receipt of each monthly invoice. Finally, plaintiff argues that the actual product is a telephone authorization code; therefore, the physical card is insignificant.

■ We find plaintiff's arguments unpersuasive. . Regulation Z broadly defines "credit" as "the right to defer payment of debt or to incur debt and defer its payment." § 226.2(a)(14). A "credit card" is defined as "any card, plate, coupon book, or other single credit device that may be used from time to time to obtain credit." *Id.* at § 226.2(a)(15). The Federal Reserve Board has provided a list of examples of credit cards. *See* 12 C.F.R. pt. 226, Supp. 1 § 226.2(a)(15). Plaintiff correctly notes that a telephone calling card is not specifically listed. We find, however, that the list does include "an identification card that permits the customer to defer payment on a purchase." *Id.* The telephone calling card at issue precisely meets this definition because the Telco card permitted Race Rock to defer payment on the purchase of telephone time until the invoice was due and payable. We agree with defendant's view of the regulation and conclude that because a telephone calling card allows the holder to obtain services and delay the payment for those services, it is covered by the protections of Regulation Z.

Plaintiff further tries to distinguish its card from a credit card by conceding that

its telephone calling card may in fact be a "charge card," which the regulation defines as a "card" used "in connection with an account on which outstanding balances cannot be carried from one billing cycle to another and are payable when a periodic statement is received." 12 C.F.R. pt. 226 Supp. I § 2(a)(15) ¶ 3 (1999). This argument, however, does not save plaintiff's case. Although the regulations recognize a distinction between credit and charge cards in relation to applications and solicitations, disclosure requirements, changes in account insurance, and the effect of state laws, *see, e.g.,* §§ 226.5a, 226.9(e), 226.9(f), and 226.28(d), and appendices G–10 through G–13, the regulations are notably silent as to any distinction between credit and charge cards for the purposes of the applicability of § 226.12(b), the provision governing unauthorized use. Thus, even if the Telco card were deemed a charge card, we find that it is still governed by the protections of Regulation Z.

II. *May a party limit the scope of Regulation Z protections through its tariffs?*

■ Plaintiff also argues that its tariff with the Federal Communications Commission (FCC) supercedes Regulation Z. The "filed tariff doctrine" teaches that the tariff which a telephone service provider files with the FCC governs the terms of the agreement between the customer and the provider. *See AT & T v. Central Office Tel., Inc.,* 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998). Plaintiff's tariff states that "[t]he Customer shall not be responsible for charges in connection with the unauthorized use of Authorization Codes *arising after the Customer notifies the Company of loss, theft, or other breach of security of such Authorization Codes.*" Telco Tariff § 2.8.3 (Def. Attach 7) (emphasis added). In the instant case, Telco argues that unauthorized calls exceeding $92,000 were incurred before Race Rock notified Telco. Therefore, under the terms of Telco's tariff, Race Rock is liable for the full value of these calls. Plaintiff

relies on several cases for the proposition that tariffs are *per se* reasonable and are not subject to collateral attack through the courts. *See, e.g., MCI Telecommunications Corp. v. Graham,* 7 F.3d 477, 479 (6th Cir.1993) (stating that "tariffs filed with the FCC conclusively and exclusively control the rights and liabilities between a carrier and its customer."); *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 18 (2nd Cir.1994); *Kutner v. Sprint Communications Co.,* 971 F.Supp. 302, 305–06 (W.D.Tenn.1997).

Plaintiff's reliance on these cases is misplaced for several reasons. None of these cases analyzed whether a court could ignore a federal consumer-protection regulation simply because a tariff was filed with the FCC. The *MCI* case dealt with whether federal courts have jurisdiction to hear billing-dispute cases arising out of long-distance contracts where the long-distance provider had filed tariffs with the FCC. The issue was one of jurisdiction and the case did not at all address the applicability of federal regulations. In *Wegoland,* the issue was whether plaintiffs could attack long-distance rates on the theory that the providers had engaged in fraud. Although the Second Circuit broadly reaffirmed the "filed tariff" doctrine (holding that suits against long-distance companies for unreasonable rates were barred if the defendant had filed a rate tariff with the FCC), the court did not discuss whether federal regulations should be set aside whenever a tariff has been filed. As for the *Kutner* decision, which held that the filed tariff doctrine mandated dismissal of plaintiff's fraud claim, nothing in that case suggests that filed tariffs render federal regulations void or inapplicable.

■ We have not found any authority to support plaintiff's position that a tariff filed with the FCC can change the statutory cap on liability for unauthorized use. Although the filed tariff doctrine preempts state law actions for breach of contract or tortious interference with contractual rela-

tions (in part, because contracts between a provider and its customer include material from the provider's brochure and understandings reached with the provider's representatives), the tariff cannot change a statutorily imposed liability cap. *See Chartways Techs. v. AT & T Communications*, 8 F.C.C.R. 5601, 5601 (1993) (FCC Decision) ("A customer's liability for unauthorized use of calling card services is determined by statute and is subject to specific restrictions under the Truth in Lending Act and Federal Reserve Board Regulations. AT & T has no discretion to adopt a higher liability limit.") We agree with defendant that to find in plaintiff's favor on this issue would allow utility companies to contract around important consumer protections simply by filing tariffs. This result would create confusion and uncertainty among potential customers who would have to investigate each long distance company's FCC tariffs to determine their liability under various calling plans. For these reasons, we find that Telco's filing of a tariff does not exempt its telephone calling cards from the protections of Regulation Z.

### CONCLUSION

We conclude that the most persuasive legal argument is defendant's reliance on the Final Rule amending 12 C.F.R. § 226.3, in which the Federal Reserve notes that "[t]he vast majority of credit cards that are affected by this amendment are telephone calling cards." Truth in Lending; Credit Cards; Issuance and Liability, 49 Fed.Reg. 46,989, 46,990 (1984). From that statement, coupled with the broad definitions of credit in the regulations, we are satisfied that it was the clear intention of the Federal Reserve to include telephone calling cards within the protections of Regulation Z's liability cap. Moreover, this conclusion is fully consistent with the consumer protection concerns addressed in Regulation Z. Credit cards are subject to the $50 cap, presumably, because they can be easily stolen and massive bills can be amassed in a very short time. Both of those vulnerabilities are equally present with telephone calling cards. Because the purpose of § 226.12(b) is to protect consumers, it makes little difference if the entire telephone bill is due and payable at the end of the month, or if the customer chooses to pay a finance fee. The distinctions between credit cards and charge cards—and credit cards and telephone calling cards, for that matter—are irrelevant to the ultimate goal of protecting the consumer from being liable for unauthorized use. Finally, imposing a $50 cap may provide an incentive to telephone calling card companies to make their accounts more secure, which would cut down on unauthorized use and improve the overall profitability of the enterprise.

For the reasons stated above, defendant's Motion to Dismiss will be GRANTED.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.