A02A1124. COMMUNICATIONS NETWORK SERVICES, INC.
v. MCI WORLDCOM COMMUNICATIONS, INC. et al.
(573 SE2d 461)

JOHNSON, Presiding Judge.

When Communications Network Services, Inc. ("CNS") failed to pay for telephone communications services, the service providers — MCI WorldCom Communications, Inc. ("MCI") and MFS Telecom, Inc. ("MFS") — terminated CNS' telephone services. MCI and MFS then sued CNS, asserting claims based on breach of contract, breach of tariffs, quantum meruit, and other causes of action.

Arguing that MCI and MFS had requested payments not authorized by contract and then improperly terminated service based on nonpayment of those charges, CNS filed a countersuit for damages alleging that MCI and MFS were liable for breach of contract and interference with contractual and business relations.

MCI and MFS moved for summary judgment on CNS' counterclaims, arguing that (1) CNS' claims are barred by the filed tariff doctrine; (2) the express terms of the tariffs bar CNS' claims, since they give MCI the right to terminate service in its sole discretion, given CNS' failure to provide a deposit or assurance of payment once CNS began accruing excessive monthly charges; and (3) the tariffs and contract contain limitation of liability clauses which preclude the relief CNS requests in the counterclaims.

Finding that the termination of service was authorized by the plain language of controlling federal tariffs, the trial court granted MCI's and MFS' motion for summary judgment on CNS' counterclaims. CNS appeals from that judgment. For the reasons which follow, we affirm.

The undisputed facts relevant to this appeal are as follows: CNS sold prepaid calling cards to the public. CNS had no telecommunications facilities or capabilities of its own, so it relied upon other companies to supply the necessary telephone carrier services, circuitry, and data transmission services. CNS entered into an agreement with MFS for the provision of circuits and data transmission services, and

into a separate contract with MCI for long distance telephone carrier services.[1]

CNS began receiving telephone service from MCI in June 1998.[2] In its credit application, CNS estimated that its monthly usage would be $25,000 and requested a credit limit in that amount. In June and July 1998, CNS was billed $6,410 and $8,668. CNS paid these bills in full. But in August, CNS' usage increased to $1.8 million. And in September, its usage was $1.7 million.

On September 17, concerned about whether CNS would be able to pay for the increased usage, MCI gave CNS notice that all services would be terminated unless CNS paid a deposit in the amount of its August usage — $1.8 million (which MCI later reduced to $750,000). CNS failed to pay the deposit, August's bill, or September's bill. CNS also failed to pay MFS' invoices since August. In October, MCI terminated service to CNS. Likewise, MFS gave notice and discontinued providing service to CNS.

According to CNS, its contract with MCI contained no monthly limits on usage and gave CNS 30 days to pay invoices. CNS urges that neither MCI nor MFS had any contractual right to demand immediate payment in September and then terminate service when the payment was not made. CNS argues that the termination amounted to wilful misconduct, liability for which MCI and MFS cannot escape. We agree with the trial court that the facts demonstrate that MCI and MFS are entitled to judgment as a matter of law on CNS' countersuit.

The relationships between telecommunications carriers and their customers are governed by a comprehensive federal regulatory scheme set forth in the Federal Communications Act of 1934, 47 USC § 201 et seq. ("FCA"). At the heart of this framework are the tariffs filed by the telecommunications carriers.

Section 203 (a) of the FCA requires carriers such as MCI and MFS to file with the Federal Communications Commission schedules or tariffs showing all charges and the factors affecting the charges. It requires carriers to provide service according to the rates and conditions set forth in the tariffs and forbids any deviation from those rates and conditions.[3] A tariff which the statute requires to be filed constitutes the law and is not merely a contract.[4] The tariffs' terms may not be varied by any contract or agreement.[5] Actions to collect

---

[1] MCI and MFS are separate entities, but they are both subsidiaries of WorldCom, Inc.
[2] MFS and CNS had been doing business for several years without a written contract.
[3] 47 USC § 203 (c).
[4] See *Western Union Intl. v. Data Dev.*, 41 F3d 1494, 1496 (11th Cir. 1995).
[5] See *AT&T Co. v. Central Office Tel.*, 524 U. S. 214, 222-227 (118 SC 1956, 141 LE2d 222) (1998).

long distance telephone charges are in an area preempted by federal law, so that they are more than simple contract actions.[6] We note that even the MCI contract expressly provides that CNS would receive service pursuant to federal tariffs, and that all terms and conditions of the tariffs are incorporated into the agreement.[7]

In this case, the tariffs expressly limit MCI's liabilities to CNS. Tariff number 1 provides that MCI shall not be liable for damages arising out of or related to events, acts, rights, or privileges contemplated in the tariff, except that the tariff does not limit liability for wilful misconduct. It further provides that MCI is not liable for direct or indirect damages, and that the warranties and remedies in the tariff are exclusive. Tariff number 2 contains substantially identical provisions.

The tariffs also expressly address conditions under which service to CNS could be terminated. The tariffs expressly preserve MCI's right to discontinue furnishing service when the customer is using the service in violation of the provisions of the tariffs. The tariffs enumerate the conditions under which MCI could terminate service, including fraud by the customer, or if MCI deems termination necessary to protect its facilities or services.

The tariffs also provide that MCI could terminate service if it determines that a customer is financially unable to satisfy its payment obligations. And that customers whose creditworthiness is unacceptable or is not a matter of general knowledge may be denied service or required to make a deposit *at any time*. Further, the tariffs provide that if MCI, in its sole discretion, determines that a customer is not capable of satisfying its payment obligations, services may be cancelled.

Similarly, MFS' tariffs expressly limit its liability to wilful misconduct and preclude liability for any direct or indirect damages to a customer as a result of its service, equipment, acts, omissions, or negligence. The tariffs also state that any liability shall not exceed sums actually paid by the customer for the services in the month in which the event complained of occurred. The tariffs authorize MFS to demand a deposit to safeguard its interests, and to terminate service if a customer does not make the requested deposit.

The tariffs expressly gave MCI the right to terminate services under the circumstances presented in this case. The tariffs expressly

---

[6] See *Intl. Magazine Svc. &c. v. Allnet Communications Svcs.*, 220 Ga. App. 160 (469 SE2d 305) (1996).

[7] The contract also provides that, in the event of a conflict between the agreement and the tariffs, the terms of the agreement would control. Because there was no conflict between the two related to the payment request and tariff violations at issue, though, we agree with the trial court that the applicability of the provision need not be reached in this appeal.

allowed MCI to request a deposit or other payment assurance and terminate services due to a customer's failure to make the requested payment. When CNS' usage increased, the tariffs authorized MCI to request assurances of payment of up to two months charges. And MFS' tariffs allowed it to request a deposit to safeguard its interests and to guarantee the payment of charges under its tariffs. Both MCI's and MFS' tariffs allowed them to discontinue services if CNS violated the tariffs. CNS' failure to make the requested payments was a violation of the tariffs, which justified the termination of service.

CNS' contract-based argument that it was not yet late in its payments when MCI demanded the September payment ignores the fact that the tariffs authorize a demand for a deposit or advance payment at any time if a customer's creditworthiness is not acceptable or if MCI or MFS needs assurance of the customer's ability to pay, and termination where there is fraud by the consumer or where termination is deemed necessary to protect the provider. We point out that the fact that MCI did not refer to the payment as a deposit when it made the demand is not critical. And we note that there is no evidence supporting CNS' contention that MCI and MFS engaged in any wilful misconduct.

As the trial court held, the filed tariff doctrine preempts CNS' counterclaims.[8] The trial court did not err in granting summary judgment in favor of MCI and MFS on the countersuit filed by CNS.

*Judgment affirmed. Blackburn, C. J., and Miller, J., concur.*

DECIDED OCTOBER 31, 2002.

*Schweber, Izenson & Anderson, Scott A. Schweber*, for appellant.
*Macey, Wilensky, Cohen, Whittner & Kessler, Susan L. Howick*, for appellees.

---

[8] See *AT&T*, supra at 227; *Intl. Telecommunications &c. v. MCI Telecommunications Corp.*, 892 FSupp. 1520, 1540 (N.D. Ga. 1995).