# AMERICAN TELEPHONE & TELEGRAPH CO. *v.*
## CENTRAL OFFICE TELEPHONE, INC.

No. 97–679.   Argued March 23, 1998—Decided June 15, 1998

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. REHNQUIST, C. J., filed a concurring opinion, *post,* p. 228. STEVENS, J., filed a dissenting opinion, *post,* p. 231. O'CONNOR, J., took no part in the consideration or decision of the case.

*David W. Carpenter* argued the cause for petitioner. With him on the briefs were *Carter G. Phillips, Thomas W. Merrill, Peter D. Keisler,* and *Marc E. Manly.*

*Bruce M. Hall* argued the cause and filed a brief for respondent.*

JUSTICE SCALIA delivered the opinion of the Court.

Respondent Central Office Telephone, Inc. (COT), a reseller of long-distance communications services, sued petitioner AT&T, a provider of long-distance communications services, under state law for breach of contract and tortious interference with contract. Petitioner is regulated as a common carrier under the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U. S. C. § 151 *et seq.* The issue before us is whether the federal filed-tariff requirements of the Communications Act pre-empt respondent's state-law claims.

I

Respondent purchases "bulk" long-distance services—volume-discounted services designed for large customers—from long-distance providers, and resells them to smaller customers. Like many other resellers in the telecommunications industry, respondent does not own or operate facilities of its own; it is known as a "switchless reseller," which is the industry nomenclature for arbitrageur. Of course respondent passes along only a portion of the bulk-purchase discount to its aggregated customers, and retains the remaining discount as profit.

Petitioner provides long-distance services and, as a common carrier under the Communications Act, § 153(h), must

---

*Gary M. Epstein, Maureen E. Mahoney, Teresa D. Baer, Walter H. Alford, William B. Barfield, M. Robert Sutherland,* and *Michael J. Zpevak* filed a brief for the United States Telephone Association et al. as *amici curiae* urging reversal.

*Henry D. Levine, Ellen G. Block,* and *James S. Blaszak* filed a brief for the Ad Hoc Telecommunications Users Committee et al. as *amici curiae.*

observe certain substantive requirements imposed by that law. Section 203 of the Act requires that common carriers file "schedules" (also known as "tariffs") containing all their "charges" for interstate services and all "classifications, practices, and regulations affecting such charges." § 203(a). The Federal Communications Commission (FCC), which is the agency responsible for enforcing the Act, requires carriers to sell long-distance services to resellers such as respondent under the same rates, terms, and conditions as apply to other customers.

Prior to 1989, petitioner had developed a type of long-distance service known as Software Defined Network (SDN), designed to meet the needs of large companies with offices in multiple locations. SDN established a "virtual private network" that allowed employees in different locations to communicate easily. For example, an employee in Washington could call a co-worker in Denver simply by dialing a four-digit extension. SDN customers, in exchange for a commitment to purchase large volumes of long-distance communication time, received this service at a rate much below what it would otherwise cost.

Several changes to SDN in 1989 made the service extremely attractive to resellers, such as respondent, who aggregate smaller customers. Petitioner developed the capability to allow customers to use ordinary ("switched access") telephone lines to connect locations to their SDN networks. Previously, locations had to be connected over special "dedicated access" lines, which are direct lines from a location's telephone system to petitioner's long-distance network, bypassing the switches of the local exchange carrier. Dedicated access involves large fixed costs, so it is cost effective only when a location originates a large volume of calls. Switched access, in contrast, does not entail additional high fixed costs, so it is better suited to small users and hence to resellers. Petitioner also instituted two pricing promotions for SDN in 1989: additional discounts from the basic SDN

rates for customers making large usage and duration commitments, and waiver of installation charges for customers making multiyear commitments (subject to penalties for early termination). Petitioner also added a new billing option. In addition to network billing, whereby petitioner prepares a single bill that applies the tariffed rate to all usage at all locations, petitioner started to offer multilocation billing (MLB), which allows the SDN volume discounts to be apportioned between an SDN customer and individual locations on its network, with the proportion being chosen by the customer. Under this option, petitioner sends bills directly to the customer's individual locations (which, in the case of resellers, means to the reseller's customers) but the customer (or reseller) remains responsible for all payments. The tariff provides, however, that petitioner is not responsible for the allocation of charges. See AT&T Tariff FCC No. 1, § 6.2.4 (1986), App. to Brief for Petitioner 24a.

Attracted by these changes, in October 1989, respondent approached petitioner regarding its possible purchase of SDN. LaDonna Kisor, a sales representative in petitioner's Portland, Oregon, office, described the service and gave respondent literature on SDN. She predicted that petitioner could establish an initial SDN network for respondent in four to five months, and could thereafter add new locations within 30 days of receiving an order. Respondent subscribed to a tariffed switched-access SDN plan under which the up-front installation charges would be waived and respondent would receive a 17% to 20% discount off basic SDN rates in exchange for a 4-year commitment to purchase two million minutes of service annually. Respondent also requested MLB. Petitioner confirmed respondent's order, stating that respondent would obtain SDN "'pursuant to the rates, terms and conditions in AT&T's [FCC Tariff No. 1],'" and that the provisions of the tariff, "'including limitations on AT&T's liabilities, shall govern your and AT&T's obligations and liabilities with respect to the service and options you have

selected.'" Brief for Petitioner 14. Respondent accepted these terms in writing on October 30, 1989.

By February 1990, it had become apparent that the demand for SDN exceeded petitioner's expectations—largely because of the switchless resellers attracted to the service. Petitioner could not fill the volumes of switched-access orders as rapidly as dedicated access orders, or as quickly as petitioner's personnel had predicted. Accordingly, Ms. Kisor notified respondent that it would take up to 90 days to add new locations after the initial SDN was established. She suggested placing respondent's customers with another AT&T service, the Multilocation Calling Plan (MLCP), until they could be placed on SDN. Respondent agreed to this, and ordered MLCP. Again, respondent signed a letter confirming that MLCP "'is provided under the terms and conditions stated in AT&T's Tariff F. C. C. Nos. 1 and 2.'" Brief for Appellant in Nos. 94–36116, 94–36156 (CA9), p. 15.

Ms. Kisor informed respondent that its initial SDN network was functioning in April 1990. At that point, respondent elected to increase to a larger SDN volume commitment in order to qualify for a larger discount. In placing this order, respondent signed a form stating that the SDN service "'WILL BE GOVERNED BY THE RATES AND TERMS AND CONDITIONS IN THE APPROPRIATE AT&T TARIFFS.'" Brief for Petitioner 14–15. Respondent then began reselling SDN to its own customers and placing orders with petitioner that required petitioner to treat respondent's customers as if they were new locations on a corporate SDN.

Almost from the outset, respondent experienced problems with the network, including delays in provisioning (the filling of orders) and in billing. An additional billing problem was especially damaging to respondent: respondent's customers received bills reflecting 100% of the discount instead of the 50% respondent selected. These problems continued, and in October 1990, they led respondent to switch to network bill-

ing. Although respondent continued to resell SDN, it was ultimately unable to meet its usage commitment for the first period in which it was applicable. In September 1992, respondent notified petitioner that it was terminating its SDN service effective September 30, 1992, with 18 months remaining on its contract.

Meanwhile, on November 27, 1991, respondent had filed suit against petitioner in the United States District Court for the District of Oregon. The complaint contained a variety of claims, none of which arose under the Communications Act, and ultimately two state-law claims went to trial: (1) breach of contract (including breach of an implied covenant of good faith and fair dealing); and (2) tortious interference with contractual relations (viz., respondent's contracts with its customers). Respondent's state-law claims rested on the allegation that its contracts with petitioner were not limited by petitioner's tariff but also included certain understandings respondent's president derived from reading petitioner's brochures and talking with its representatives. According to respondent, petitioner promised various service, provisioning, and billing options in addition to those set forth in the tariff. Respondent also claimed that petitioner violated its state-law implied duty of good faith and fair dealing by taking actions that undermined the purpose of the contract for respondent, which was to purchase SDN services for resale at a profit. The tortious-interference claim was derivative of the contract claim. Respondent asserted that, because respondent promised certain benefits of SDN to its customers, and because petitioner provided competing services, any intentional violation of petitioner's contractual duties constituted tortious-interference with respondent's relationship with its customers. Respondent also asserted that, since petitioner's conduct was willful, consequential damages were available under the terms of the tariff. Petitioner filed a counterclaim to recover $200,000 in unpaid tariffed charges

from April to October 1990, and to obtain the termination charges that respondent did not pay in 1992.

Throughout the proceedings in District Court, petitioner argued that respondent's state-law contract and tort claims were pre-empted by the filed-tariff requirements of § 203 of the Act. The Magistrate Judge rejected this argument and instructed the jury to consider not only the written subscription agreements, but also any statements made or documents furnished before the parties signed the agreements "'if you find that the parties intended that those statements or written materials form part of their agreements.'" Brief for Petitioner 18. The Magistrate Judge also instructed the jury that it could not find for respondent on its contract claims unless it found that petitioner engaged in willful misconduct. He declined to instruct on punitive damages for the tortious-interference claim. The jury found for respondent on its state-law claims, rejected petitioner's counterclaim, and awarded respondent $13 million in lost profits. The Magistrate Judge reduced the judgment to $1.154 million, which represented the lost profits respondent claimed during the period before it canceled SDN on September 30, 1992; he found that there was no competent evidence for lost profits after that date. The Court of Appeals, over a dissent by Judge Brunetti, affirmed the judgment but reversed the Magistrate Judge's failure to instruct on punitive damages and remanded for a trial on that aspect of the case. 108 F. 3d 981 (CA9 1997). We granted certiorari to determine whether the federal filed-rate requirements of § 203 pre-empt respondent's claims. 522 U. S. 1024 (1997).

## II

Section 203(a) of the Communications Act requires every common carrier to file with the FCC "schedules," i. e., tariffs, "showing all charges" and "showing the classifications, practices, and regulations affecting such charges." 47 U. S. C. § 203(a). Section 203(c) makes it unlawful for a carrier to

"extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule." These provisions are modeled after similar provisions of the Interstate Commerce Act (ICA) and share its goal of preventing unreasonable and discriminatory charges. *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S. 218, 229–230 (1994). Accordingly, the century-old "filed rate doctrine" associated with the ICA tariff provisions applies to the Communications Act as well. See *id.*, at 229–231; *Arkansas Louisiana Gas Co.* v. *Hall*, 453 U. S. 571, 577 (1981); cf. *United States Nav. Co.* v. *Cunard S. S. Co.*, 284 U. S. 474, 481 (1932). In *Louisville & Nashville R. Co.* v. *Maxwell*, 237 U. S. 94, 97 (1915), we described the basic contours of the filed rate doctrine under the ICA:

> "Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination."

Thus, even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff. *Kansas City Southern R. Co.* v. *Carl*, 227 U. S. 639, 653 (1913).

While the filed rate doctrine may seem harsh in some circumstances, see, *e. g., Maislin Industries, U. S., Inc.* v. *Primary Steel, Inc.*, 497 U. S. 116, 130–131 (1990), its strict application is necessary to "prevent carriers from intentionally 'misquoting' rates to shippers as a means of offering them rebates or discounts," the very evil the filing requirement seeks to prevent. *Id.*, at 127. Regardless of the carrier's motive—whether it seeks to benefit or harm a particular customer—the policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services. It is that antidiscriminatory policy which lies at "the heart of the common-carrier section of the Communications Act." *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co., supra,* at 229.

The Ninth Circuit thought the filed rate doctrine inapplicable "[b]ecause this case does not involve rates or rate-setting, but rather involves the provisioning of services and billing." 108 F. 3d, at 990. Rates, however, do not exist in isolation. They have meaning only when one knows the services to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa. "If 'discrimination in charges' does not include non-price features, then the carrier could defeat the broad purpose of the statute by the simple expedient of providing an additional benefit at no additional charge. . . . An unreasonable 'discrimination in charges,' that is, can come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price." *Competitive Telecommunications Assn.* v. *FCC*, 998 F. 2d 1058, 1062 (CADC 1993). The Communications Act recognizes this when it requires the filed tariff to show not only "charges," but also "the classifications, practices, and regulations affecting such charges," 47 U. S. C. § 203(a); and when it makes it unlawful to "extend to any person any privileges or facilities in such communication, or employ or en-

force any classifications, regulations, or practices affecting such charges" except those set forth in the tariff, § 203(c).

Unsurprisingly, the cases decided under the ICA make it clear that discriminatory "privileges" come in many guises, and are not limited to discounted rates. "[A] preference or rebate is the necessary result of every violation of [the analog to § 203(c) in the ICA] where the carrier renders or pays for a service not covered by the prescribed tariffs." *United States* v. *Wabash R. Co.*, 321 U. S. 403, 412–413 (1944). In *Chicago & Alton R. Co.* v. *Kirby*, 225 U. S. 155 (1912), we rejected a shipper's breach-of-contract claim against a railroad for failure to ship a carload of race horses by a particularly fast train. We held that the contract was invalid as a matter of law because the carrier's tariffs "did not provide for an expedited service, nor for transportation by any particular train," and therefore the shipper received "an undue advantage . . . that is not one open to others in the same situation." *Id.*, at 163, 165. Similarly, in *Davis* v. *Cornwell*, 264 U. S. 560 (1924), we invalidated the carrier's agreement to provide the shipper with a number of railroad cars on a specified day; such a special advantage, we said, "is illegal, when not provided for in the tariff." *Id.*, at 562. See also *Kansas City Southern R. Co.* v. *Carl, supra,* at 653; *Wight* v. *United States,* 167 U. S. 512, 517–518 (1897); I. Lake, Discrimination by Railroads and Other Public Utilities 310–315 (1947).

### III

The Ninth Circuit distinguished the Court's filed rate cases involving claims for special services on the ground that the services at issue there "should have been included in the tariff and made available to all" because "the customer would have been expected to pay a higher rate" for those services. 108 F. 3d, at 989, n. 9. But that is precisely the case here. Indeed, the additional services and guarantees that respondent claims it was entitled to by virtue of Ms. Kisor's representations and petitioner's sales brochures—

viz., faster provisioning, the allocation of charges through multilocation billing, and various matters relating to deposits, calling cards, and service support, see 108 F. 3d, at 987–988—all pertain to subjects that are *specifically addressed* by the filed tariff. See AT&T Tariff FCC No. 1, §2.5.10 (provisioning of orders); §6.2.4 (allocation of charges); §2.5.6 (deposits); §2.5.12.B (calling cards); §6.2.5 (service supports).

The Ninth Circuit agreed that all of respondent's claims except those relating to provisioning and billing would be pre-empted if the filed rate doctrine applied. 108 F. 3d, at 990. But even provisioning and billing are, in the relevant sense, "covered" by the tariff. For example, whereas respondent asks to enforce a guarantee that orders would be provisioned within 30 to 90 days, the tariff leaves it up to petitioner to "establis[h] and confir[m]" a due date for provisioning, requires that petitioner merely make "every reasonable effort" to meet that due date, and if it fails gives the customer no recourse except to "cancel the order without penalty or payment of nonrecurring charges." §2.5.10(B). Faster, guaranteed provisioning of orders for the same rate is certainly a privilege within the meaning of 47 U.S.C. §203(c) and the filed rate doctrine. Cf. *Chicago & Alton R. Co.* v. *Kirby, supra,* at 163 (refusing to enforce promise for faster, guaranteed service not included in the tariff). As for billing, whereas respondent claims that, pursuant to the MLB option, petitioner promised to allocate usage and charges accurately among respondent's customers, the tariff provides that petitioner "will not allocate . . . usage or charges" among the locations on the customer's network and "is not responsible for the way that the Customer may allocate usage or charges." AT&T Tariff FCC No. 1, §6.2.4. Any assurance by petitioner that it would allocate usage and charges and take responsibility for the task would have been in flat contradiction of the tariff. See *Chesapeake & Ohio R. Co.* v. *Westinghouse, Church, Kerr & Co.,* 270 U.S. 260, 266 (1926).

The Ninth Circuit distinguished respondent's claims from those in our filed-rate cases involving special services in one other respect: according to respondent, the "special services" that it sought were provided by petitioner, without charge, to other customers, 108 F. 3d, at 989, n. 9. Even if that were so, the claim for these services would still be pre-empted under the filed rate doctrine. To the extent respondent is asserting discriminatory treatment, its remedy is to bring suit under § 202 of the Communications Act.[1] To the extent petitioner is claiming that its own claims for special services are not really special because other companies get the same preferences, "that would only tend to show that the practice was unlawful [with regard to] the others as well." *United States* v. *Wabash R. Co., supra,* at 413. Because respondent asks for privileges not included in the tariff, its state-law claims are barred in either case.

## IV

Our analysis applies with equal force to respondent's tortious-interference claim because that is wholly derivative of the contract claim for additional and better services. Respondent contended that the tort claim was based on "AT&T's refusal to provide [respondent] with certain types of service" and the Magistrate Judge agreed, noting that " 'the claims in this case, even the tort claim, . . . stem from the alleged failure of AT&T to comply with its contractual relationship.' "[2] Brief for Appellant in Nos. 94–36116, 94–

---

[1] Eight months after the close of discovery (and well after the 2-year statute of limitations in the Communications Act, § 415), respondent sought leave to file a second amended complaint to add a § 202 claim. The Magistrate Judge denied the request. Respondent did not appeal that ruling.

[2] The dissent argues that "the jury's verdict on respondent's tort claim is supported by evidence that went well beyond, and differed in nature from, the contract claim," *post,* at 231, which the dissent asserts requires us to remand this case rather than reverse the judgment. This issue of noncontract evidence neither was included within the question presented

36156 (CA9), p. 33. Respondent can no more obtain unlawful preferences under the cloak of a tort claim than it can by contract. "The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *Keogh* v. *Chicago & Northwestern R. Co.*, 260 U. S. 156, 163 (1922); see also *Maislin*, 497 U. S., at 126.

The saving clause of the Communications Act, § 414, contrary to respondent's reading of it, does not dictate a different result. Section 414 copies the saving clause of the ICA, and we have long held that the latter preserves only those rights that are not inconsistent with the statutory filed-tariff requirements. *Adams Express Co.* v. *Croninger*, 226 U. S. 491, 507 (1913). A claim for services that constitute unlawful preferences or that directly conflict with the tariff—the basis for both the tort and contract claims here—cannot be "saved" under § 414. "Th[e saving] clause ... cannot in reason be construed as continuing in [customers] a common law

_____

for our review ("Whether . . . the Ninth Circuit improperly allowed state-law contract and tort claims based on a common carrier's failure to honor an alleged side agreement to give its customer better service than called for by the carrier's tariff") nor was raised by respondent as an alternative ground in support of the judgment. Nor has respondent ever suggested the need for a remand, even though the petition for certiorari sought not merely reversal, but *summary* reversal. In its brief on the merits, respondent argued that the intentional tort claim was not pre-empted because AT&T's *willful* breach of its contractual commitments was not protected by the filed rate doctrine. There was no hint of an argument that, *even if* that willful breach could not form the basis for an action, *other* alleged intentional acts sufficed to support the judgment below. At no point has respondent disputed the Magistrate Judge's finding that the tort claim is derivative of the contract claim, or the Ninth Circuit's description of its tort claim as based on the fact that "because COT had promised certain benefits of SDN to its customers, and because AT&T provided competing services, any violation of AT&T's contractual duties constituted tortious interference with COT's relationship with its customers." 108 F. 3d 981, 988 (1997). Contrary to the dissent's assertion, we have no obligation to search the record for the existence of a nonjurisdictional point not presented, and to consider a disposition (remand instead of reversal) not suggested by either side.

right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself." *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 446 (1907).

Finally, we reject respondent's argument that, even if the tariff exclusively governs the parties' relationship, the relief awarded is consistent with the tariff, since AT&T Tariff FCC No. 1, § 2.3.1 provides that petitioner's "liability, if any, for its willful misconduct is not limited by this tariff." Respondent reasons that, because the jury found that petitioner engaged in willful misconduct, the verdict does not conflict with the tariff. Section 2.3.1, however, cannot be construed to do what the parties have no power to do. It removes only those limitations upon liability imposed *by the tariff*, not those imposed by law. It is the Communications Act that renders the promise of preferences unenforceable. The tariff can no more exempt the broken promise of preference that is willful than it can the broken promise of preference that is unintentional. (In fact, perversely enough, the willful breach displays a greater, if belated, attempt to comply with the law.)

\* \* \*

Because respondent's state-law claims are barred by the filed rate doctrine, we reverse the judgment of the Ninth Circuit.

*It is so ordered.*

JUSTICE O'CONNOR took no part in the consideration or decision of this case.

CHIEF JUSTICE REHNQUIST, concurring.

The Court concludes that respondent's tortious interference claim is "wholly derivative of the contract claim" and therefore barred by the filed rate doctrine. The Court accepts the Magistrate Judge's finding to that effect, *ante,* at 226, and I agree: The acts of tortious interference asserted

against AT&T amount to no more than an intentional refusal to provide services to respondent in an amount or manner contrary to the filed tariff.

I write separately to note that this finding is necessary to the conclusion that respondent's state-law tort claim may not proceed. As the majority correctly states, the filed rate doctrine exists to protect the "antidiscriminatory policy which lies at 'the heart of the common-carrier section of the Communications Act.'" *Ante*, at 223. Central to that antidiscriminatory policy is the notion that all purchasers of services covered by the tariff will pay the same rate. The filed rate doctrine furthers this policy by disallowing suits brought to enforce agreements to provide services on terms different from those listed in the tariff. This ensures that the tariff governs the terms by which the common carrier provides those services to its customers.

It is crucial to note, however, that this is all the tariff governs. In order for the filed rate doctrine to serve its purpose, therefore, it need pre-empt only those suits that seek to alter the terms and conditions provided for in the tariff. This is how the doctrine has been applied in the past. In *Chicago & Alton R. Co.* v. *Kirby*, 225 U. S. 155 (1912), for example, respondent entered into a contract with petitioner to ship horses from Springfield, Illinois, to New York City via a special fast train. The tariff that the petitioner had filed "did not provide for an expedited service, nor for transportation by any particular train." *Id.*, at 163. The Court ruled that respondent's suit to enforce the special arrangement could not proceed:

> "An advantage accorded by special agreement which affects the value of the service to the shipper and its cost to the carrier should be published in the tariffs, and for a breach of such a contract, relief will be denied, because its allowance without such publication is a violation of the act. It is also illegal because it is an undue advan-

tage in that it is not one open to all others in the same situation." *Id.,* at 165.

In *Keogh* v. *Chicago & Northwestern R. Co.,* 260 U. S. 156, 163 (1922), the question was not whether a separate contract could be enforced, but rather whether petitioner could bring an antitrust complaint challenging the rate that respondents had filed in their tariff. The Court ruled that he could not:

> "The legal rights of shipper as against carrier *in respect to a rate* are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. *The rights as defined by the tariff* cannot be varied or enlarged by either contract or tort of the carrier." *Ibid.* (emphasis added).

In this case respondent's contract claim seeks to enforce side arrangements that it made with petitioner. Respondent contends that petitioner promised to provide it with services on terms different from those listed in the tariff. As the above cases make clear, the filed rate doctrine bars such a claim. Respondent's tort claim is entirely derivative of its contractual claim, and the Court is therefore correct in concluding that the doctrine also bars the tort claim.

The tariff does not govern, however, the entirety of the relationship between the common carrier and its customers. For example, it does not affect whatever duties state law might impose on petitioner to refrain from intentionally interfering with respondent's relationships with its customers by means other than failing to honor unenforceable side agreements, or to refrain from engaging in slander or libel, or to satisfy other contractual obligations. The filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to its customers the services covered by the tariff. It does not serve as a shield against all

actions based in state law. It is with this understanding that I join the Court's opinion.

JUSTICE STEVENS, dissenting.

Everyone agrees that respondent's tortious interference claim would be barred by the filed rate doctrine if it is "wholly derivative of the contract claim for additional and better services." *Ante*, at 226 (majority opinion); *ante*, at 228 (REHNQUIST, C. J., concurring). Moreover, it is true that when the Magistrate Judge ruled that respondent's case would not support a punitive damages award as a matter of state law, he characterized the tort claim as "stem[ming] from the alleged failure of AT&T to comply with its contractual relationship." Tr. 2207. In my opinion, however, the jury's verdict on respondent's tort claim is supported by evidence that went well beyond, and differed in nature from, the contract claim.

If petitioner, in an effort to appropriate respondent's customers, had included with each bill sent to a customer a statement expressly characterizing respondent as an unethical, profit-hungry middleman, I would think it clear that the filed rate doctrine would not constitute a defense to such tortious conduct. The evidence in the record indicates that a similar result was obtained by mailing bills to the customers that disclosed the markup that respondent obtained on their calls.

Respondent's tort claim was also premised in part on testimony that AT&T used a telemarketer to contact respondent's customers and, without their authorization, convert them to AT&T's own long-distance service. *Id.*, at 557–558. In rejecting AT&T's motion for a directed verdict on the tort claim, the Magistrate recognized that this practice of "slamming" customers could "easily be a case of intentional interference" that would not necessarily also constitute breach of contract. *Id.*, at 2166–2167. Slamming was clearly a part of the case presented in the District Court. There was an

allegation of slamming in respondent's amended complaint;[1] in the District Court, AT&T's trial counsel took issue with respondent's effort to make slamming "a big part of this case," *id.*, at 2170, and said in closing argument that slamming "is the basis for this intentional interference" claim, *id.*, at 2921; and nothing in the jury instructions remotely suggested that the tort claim required proof of broken promises by AT&T to provide additional services. Respondent's evidence easily fits within the definition of intentional interference set forth in the jury charge:

> "COT asserts that AT&T intentionally interfered with its business relations and expectations of future business relations with its customers, the end users of its SDN service. In order to prevail on this claim, COT must prove by a preponderance of the evidence, one, that COT had business relations with the probability of future economic benefit. Two, that AT&T was aware of the relationships and expectation of future benefits. Three, that AT&T intentionally interfered with COT's business relations. Four, that AT&T interfered for an improper motive or by using improper means. And, five, that COT suffered economic injury as a result of the interference." App. 71.

It may be the fact that the billing disclosures and slamming were the consequence of negligence rather than a deliberate plan to take over a network of customers that respondent had developed, but the jury concluded otherwise. It found that petitioner acted intentionally and willfully in interfering with respondent's business relations. See *ibid.*[2] That finding is doubly significant.

---

[1] "[D]espite repeated requests by COT to AT&T, AT&T failed to rectify incidents of unauthorized changes made in the designated carriers ('slamming') of COT's customers." App. 28.

[2] The jury's $13 million damages award, reduced by the Magistrate Judge to $1.154 million, did not differentiate between the contract and tort claims.

First, as the Court acknowledges, *ante*, at 228, the jury's finding precludes a defense based on the provisions of the tariff that purport to limit petitioner's liability. Second, and of greater importance, it determines that the most egregious tortious conduct was not merely derivative of the contract violations. Enforcement of respondent's state-law right to be free from tortious interference with business relations does not somehow award respondent an unlawful preference that should have been specified in the tariff (presumably in return for an added fee or higher rate); it instead gives effect to a generally applicable right that petitioner is required, by state law, to respect in dealing with all others, customers and noncustomers alike. Thus, at least some of the tortious interference occurred independently of the customer-carrier relationship and would have been actionable even if respondent had never entered into a contract with AT&T.

The Court correctly states that the filed rate doctrine will pre-empt some tort claims, but we have never before applied that harsh doctrine to bar relief for tortious conduct with so little connection to, or effect upon, the relationship governed by the tariff. To the extent respondent's tort claim is based on petitioner's billing disclosures and slamming practices, it neither challenges the carrier's filed rates, as did the antitrust claim in *Keogh* v. *Chicago & Northwestern R. Co.*, 260 U. S. 156 (1922), nor seeks a special service or privilege of the sort requested in cases such as *Chicago & Alton R. Co.* v. *Kirby*, 225 U. S. 155 (1912), and *Davis* v. *Cornwell*, 264 U. S. 560 (1924). More akin to this case is *Nader* v. *Allegheny Airlines, Inc.*, 426 U. S. 290, 300 (1976), in which we held that a common-law tort action for fraudulent misrepresentation against a federally regulated air carrier could "coexist" with the Federal Aviation Act. To a limited degree it may be said that here, as in *Nader*, "any impact on rates that may result from the imposition of tort liability or from practices adopted by a carrier to avoid such liability would be merely incidental." *Ibid.* If the Communications Act's

saving clause[3] means anything, it preserves state-law remedies against carriers on facts such as these.

The District Court and the Court of Appeals never considered whether respondent's tort claim is wholly derivative of its contract claim for purposes of the filed rate doctrine, because those courts mistakenly believed that even the contract claim was not covered by the doctrine. On my own reading of the record, I think it clear that a portion of the tort claim is not pre-empted. The Court should therefore remand the case for a new trial rather than ordering judgment outright for AT&T.[4]

Although the Court holds broadly that respondent's tort claim is totally barred, it declines to consider whether a portion of the claim might survive on remand because this issue was not part of the question presented in the petition for certiorari and was not specifically raised by respondent. *Ante*, at 226–227, n. 2. The latter point is wholly irrelevant, precisely because of the scope of the question presented. The only question that we agreed to decide was whether the filed rate doctrine pre-empts "state-law contract and tort claims based on a common carrier's failure to honor an alleged side agreement to give its customer better service than called for by the carrier's tariff." Pet. for Cert. i. The Court answers that legal question, and then decides an additional, factual one: whether respondent's tort claim is "based on" AT&T's "failure to honor an alleged side agreement," and thus is "wholly derivative" of the pre-empted contract claim. In resolving that issue, the Court cannot

---

[3] "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U. S. C. §414.

[4] Beyond the billing disclosures and slamming, respondent asserts that AT&T also misappropriated customer information from respondent's confidential data base. Brief for Respondent 4. That basis for a tort remedy, if supported by sufficient evidence, would also appear not to be pre-empted by the filed rate doctrine.

simply rely on AT&T's bald assertion, supported only by a statement of the Magistrate taken out of context, that the tort claim is "wholly derivative"; we have an obligation either to study the record or at least to remand and allow the lower courts to consider the proper application of the legal rule to the facts of this case.

I respectfully dissent.