GLOBAL NAPS, INC., Petitioner–Appellant,

v.

VERIZON NEW ENGLAND INC. f/k/a New England Telephone and Telegraph Company d/b/a Bell Atlantic—Vermont, Inc., Vermont Public Service Board, and Michael H. Dworkin, David C. Coen, and John D. Burke in their capacity as board members, Respondents–Appellees.

No. 2:03–CV–97.

United States District Court, D. Vermont.

Jan. 9, 2004.

David J. Mullett, Esq., Montpelier, VT, for Plaintiff.

Karen McAndrew, Esq., Burlington, VT, for Defendant.

### OPINION AND ORDER

SESSIONS, Chief Judge.

Global NAPS, Inc. ("Global") seeks review of a determination by the Vermont Public Service Board ("Public Service Board" or "Board") requiring Global to pay access charges to Verizon New England Inc. ("Verizon") for its long distance calls, and to cease using "virtual NXX service" ("VNXX"). All parties[1] have moved for summary judgment. For the reasons that follow, Global's motion (Doc.

12) is denied; Verizon's cross-motion (Doc. 17) is granted; and the individual board members' cross-motion (Doc. 20) is denied as moot.

## I. Background

### A. The Telecommunications Act of 1996

The Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 ("Act" or "1996 Act") amended the Communications Act of 1934. See 47 U.S.C.A. §§ 151 et seq. (West 2001). The legislation was enacted in an effort "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunication consumers and encourage the rapid deployment of new telecommunications technologies." Pub.L. No. 104–104. With the passing of the Act, Congress "ended the longstanding regime of state-sanctioned monopolies [of local telephone service]" by "fundamentally restructur[ing] local telephone markets." AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999); accord New York & Pub. Serv. Comm'n v. FCC, 267 F.3d 91, 96 (2d Cir.2001); see also Verizon Md. Inc. v. Pub. Service Comm'n, 535 U.S. 635, 638, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (Act created new telecommunications regime designed to foster competition in local telephone markets). The Act requires providers of telecommunications services to interconnect directly or indirectly with the facilities and equipment of other providers. 47 U.S.C.A. §§ 153(44), 251(a).

In order to foster the development of competitive local telephone markets, the Act imposes certain duties on the incumbent local exchange carrier ("ILEC"),[2] among them the duty to provide intercon-

---

1. The Board has been dismissed from this action by stipulation of the parties. See Stipulation of Dismissal of Vermont Public Service Board (Doc. 19).

2. A "local exchange carrier" ("LEC") provides "telephone exchange service" or "exchange access." 47 U.S.C.A. § 153(26). "Telephone exchange service is defined as

nection with its network and to negotiate in good faith the terms and conditions of interconnection agreements with other competitive local exchange carriers ("CLECs"). *Id.* §§ 251(c)(1), (2). If parties cannot agree on the terms of their interconnection agreement, either party may petition the state commission that regulates the intrastate operations of carriers to arbitrate any unresolved issues. *See id.* § 252(b)(1). The state commission must limit its consideration to the issues presented in the petition and any response thereto. *Id.* § 252(b)(4)(A). Its resolution of any open issues must meet the requirements of § 251 and any regulations prescribed by the Federal Communications Commission ("FCC") pursuant to that section. *Id.* §§ 252(c)(1), (e)(2)(B). The state commission may also enforce other requirements of state law as long as they do not prohibit or have the effect of prohibiting the ability of an entity to provide interstate or intrastate telecommunications service. *Id.* §§ 252(e)(3); 253(a). Any party aggrieved by the state commission's determination may seek review of its action in federal district court. *Id.* § 252(e)(6).

### 1. *Reciprocal Compensation*

The 1996 Act requires interconnecting LECs to establish reciprocal compensation

> (A) service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge, or (B) comparable service provided through a system of switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service.
>
> *Id.* § 153(47). "Exchange access" is defined as "the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services." *Id.* § 153(16).

arrangements for the transport and termination of telecommunications. 47 U.S.C.A. § 251(b)(5). A reciprocal compensation arrangement is one in which a carrier receives compensation from another carrier for the transport and termination of telecommunications traffic on the first carrier's network facilities. *See* 47 C.F.R. § 51.701(e) (2003).

Reciprocal compensation does not apply, however, to telecommunications traffic "that is interstate or intrastate exchange access, information access, or exchange services for such access." *Id.* § 51.701(b)(1). Interstate and intrastate exchange service, commonly referred to as "long-distance" or "toll" calls, are subject to "access charges," whereby the inter-or intraexchange carrier pays the LEC for the use of its local network facilities. *See, e.g.,* 47 C.F.R. § 69.124 (2003).[3] The FCC has authority over access charges for interstate or foreign access services. *See* 47 C.F.R. pt. 69. States generally have authority over access charges for intrastate exchange access service. *See, e.g.,* 47 U.S.C.A. § 261(c); § 923 (West 2001). The FCC is empowered to prescribe rules and regulations intended to implement the local competition provisions of the 1996 Act, however, even though the rules affect

**3.** The traditional regulatory distinction between telephone exchange service, commonly referred to as local calling, and telephone toll service, commonly referred to as long distance, that originated when telecommunications was in its infancy, may no longer make much sense in the modern world of digital communications. *See* Jeffrey I. Ryen, *The Battle over Reciprocal Compensation: The FCC's Ongoing Struggle to Regulate Intercarrier Compensation Fees for ISP–Bound Traffic,* 8 B.U.J. Sci. & Tech. L. 614, 632 (2002) (1996 Act and attendant ISP reciprocal compensation dispute offer glaring example of technology outpacing regulation; traditional regulatory assumptions that rely on distinction between "local" and "long distance" create acute challenges for FCC).

intraas well as interstate matters. *See* 47 U.S.C. § 201(b); *AT & T Corp. v. Iowa Utils.*, 525 U.S. at 377–78, 385, 119 S.Ct. 721; *see also Pac. Bell v. Pac–West Telecomm, Inc.*, 325 F.3d 1114, 1126 n. 10 (9th Cir.2003) (1996 Act granted FCC regulatory authority over those intrastate matters governed by the Act, and granted state commissions limited defined authority over interstate traffic under §§ 251 and 252 of the Act).

## B. The Regulation of ISP–Bound Traffic

Over the last few years, the FCC has undertaken to determine whether Internet telecommunications traffic should be subject to reciprocal compensation rules. Typically, individuals gain access to the Internet by directing their computers to dial a local number provided by their Internet Service Provider ("ISP"). Once the ISP modem "answers" the call and connects the user, the user communicates over the Internet by transmitting commands via the computer. The communication may then range worldwide. At issue has been whether dial-up customers make one or more than one call when they communicate over the global computer network via an ISP.

Calls to ISPs produce one-way traffic, from the calling party to the ISP. Under reciprocal compensation rules, the originating carrier pays the terminating carrier; thus the calling party's carrier would pay the carrier that serves the ISP, if ISP-bound traffic were deemed local traffic. As the FCC noted, treating ISP-bound traffic as subject to reciprocal compensa-

tion "created opportunities for regulatory arbitrage and distorted the economic incentives related to competitive entry into the local exchange and exchange access markets" because "ISPs typically generate large volumes of traffic that is virtually all one-way—that is, delivered to the ISP." *Implementation of the Local Competition Provisions in the Telecomms. Act of 1996, Intercarrier Comp. for ISP–Bound Traffic*, 16 F.C.R.R. 9151, 9153 ¶ 2 (Apr. 27, 2001) ("Remand Order").[4]

In 1999, the FCC issued a declaratory ruling that excluded ISP calls from the reciprocal compensation requirement on the theory that ISP calls were essentially non-local. *See IMPLEMENTATION OF THE LOCAL COMPETITION PROVISIONS IN THE TELECOMMS. ACT OF 1996, INTER–CARRIER COMP. FOR ISP–BOUND TRAFFIC*, 1999 WL 98037, 14 F.C.C.R. 3689, 3690 ¶ 1 (Feb. 26, 1999) ("Initial Order"). A panel of the D.C. Circuit Court of Appeals vacated the ruling in *Bell Atlantic Telephone Cos. v. FCC*, 206 F.3d 1, 9 (D.C.Cir.2000), finding that the FCC had not adequately explained its reasoning.

On remand, the FCC again considered inter-carrier compensation for ISP-bound traffic, and again concluded that such traffic is predominantly interstate access traffic and is not subject to reciprocal compensation. Remand Order at 9153 ¶ 1. It proceeded to establish an interim compensation mechanism for the delivery of ISP-bound traffic that would "limit[ ] carriers' opportunit[ies] to recover costs from other carriers and requir[e] them to recover a

---

**4.** The FCC noted that "comments in the record indicate that competitive local exchange carriers (CLECs), on average, terminate eighteen times more traffic than they originate, resulting in annual CLEC reciprocal compensation billings of approximately two billion dollars, ninety percent of which is for ISP-bound traffic." Remand Order at 9154–55

¶ 5; *see also WorldCom, Inc. v. FCC*, 288 F.3d 429, 431 (D.C.Cir.2002), *cert. denied*, 538 U.S. 1012, 123 S.Ct. 1927, 155 L.Ed.2d 848 (2003) (system attracted LECs to enter business simply to serve ISPs, making enough money from reciprocal compensation to pay ISP customers for privilege of completing calls).

greater share of their costs from their ISP customers." *Id.* at 9181 ¶ 67. It adopted a gradually declining cap over a 36–month period on the amount that carriers could recover from other carriers for delivering ISP-bound traffic. *Id.* at 9156 ¶ 7; 9187 ¶ 78. For interconnection agreements entered into after the effective date of the order, carriers would have to exchange ISP-bound traffic on a bill-and-keep basis.[5] *Id.* at 9188 ¶ 81.

Upon review of the Remand Order, the D.C. Circuit Court of Appeals panel again remanded the case, finding the FCC's rationale for its ruling untenable. *See WorldCom, Inc. v. FCC*, 288 F.3d 429, 434 (D.C.Cir.2002), *cert. denied,* 538 U.S. 1012, 123 S.Ct. 1927, 155 L.Ed.2d 848 (2003). The Court did not vacate the Remand Order, however, finding that "there is plainly a non-trivial likelihood that the Commission has authority to elect such a system [of compensation]." *Id.* It left in place the interim pricing limits, and declined to rule on the scope of the reciprocal compensation obligation, or whether handling calls to ISPs constituted "exchange access" or "telephone exchange service" as defined in 47 U.S.C. §§ 153(16) and (47). *Id.*

The Remand Order and the revised reciprocal compensation regulations thus remain in effect pending further proceedings before the FCC. Although the Remand Order specifically acknowledged that carriers exchanging ISP-bound traffic pursuant to interconnection agreements made before June 14, 2001 (the effective date of the Remand Order)[6] may be subject to state commission-arbitrated reciprocal compensation rates, all ISP-bound traffic exchanged pursuant to interconnection agreements made after that date is subject to bill-and-keep compensation. *See* Remand Order at 9189 ¶ 82.

### C. VNXX Service

Whether a telephone call is subject to access charges, i.e., is considered a "toll" call, is based on the location of the central office "switch" where a call originates and terminates. The middle three digits of a ten digit telephone number—the "NXX"—has historically been associated with a particular local calling area and with a particular switch. A call to a particular NXX therefore would identify the location where the call terminated.

It is possible, however, to assign customers "virtual NXXs," or "VNXXs," so that a call termination is identified not by its physical location but by a location of the customer's choice. The customer thus does not pay toll charges if the VNXX is the same as the NXX of the call termination, and the call would not be subject to access charges for purposes of intercarrier compensation. Essentially, VNXX service converts what would otherwise be toll calls into local calls.

### D. Proceedings Before the Vermont Public Service Board

Verizon is an ILEC in Vermont. Global is a CLEC with its principal place of business in Quincy, Massachusetts. Its principal customers are ISPs. Global offers co-

---

5. " 'Bill and keep' refers to an arrangement in which neither of two interconnecting networks charges the other for terminating traffic that originates on the other network. Instead, each network recovers from its own end-users the cost of both originating traffic that it delivers to the other network and terminating traffic that it receives from the other network." Remand Order at 9153 n. 6.

6. The Remand Order and revisions to 47 C.F.R. pt. 51 became effective thirty days after publication in the Federal Register, or June 14, 2001. *See* Remand Order, 16 F.C.C.R. at 9204, 66 Fed.Reg. 26,800 (May 15, 2001).

location to its ISP customers, the majority of whom have located in Global's facility in Quincy. Global "aggregates" its telecommunications traffic, meaning it receives dial-up Internet calls from various locations in Vermont, transports the traffic on its network back to Quincy, and delivers the calls to the ISPs there. An ISP thus does not have to locate equipment to handle calls in each local calling area, and Vermont users of the Internet have local Internet access. Global offers its customers VNXX service.

In January 2001 Global and Verizon began negotiating the terms of an interconnection agreement in Vermont. On July 23, 2002 Global petitioned the Board for arbitration. On December 26, 2002 the Board issued its Order with respect to twelve issues identified by the parties. Global has challenged the Board's resolution of two of the issues. It contends first that the Board's Order unlawfully imposes exchange access charges on what it defines as local telephone calls (Issue 3). Second, it contends that the Order unlawfully prohibits VNXX service (Issue 4).

## II. Discussion

### A. Standard of Review

■ The 1996 Act did not prescribe a standard of review for courts to apply in reviewing the action of a state commission under § 252(e)(6) of Title 47. When reviewing an action of a state agency for consistency with federal law, "*Chevron* [7]-style" deference to the agency determination is not appropriate, however, and interpretations of federal law are accorded de novo scrutiny. *See Perry v. Dowling*, 95 F.3d 231, 236 (2d Cir.1996) (citing *Turner v. Perales*, 869 F.2d 140, 141 (2d Cir.1989) (per curiam)). The Third, Fourth, Fifth, Sixth, Ninth and Tenth Circuits have ap-

plied de novo review to state commissions' interpretations of the Act and its regulations. *See Mich. Bell Tel. Co. v. MFS Intelenet of Mich., Inc.*, 339 F.3d 428, 433 (6th Cir.2003); *Southwestern Bell Tel. Co. v. Apple*, 309 F.3d 713, 718 (10th Cir.2002); *MCI Telecomm. Corp. v. Bell Atl.-Pa.*, 271 F.3d 491, 516 (3d Cir.2001), *cert. denied*, 537 U.S. 941, 123 S.Ct. 340, 154 L.Ed.2d 247 (2002); *Southwestern Bell Tel. Co. v. Pub. Util. Comm'n*, 208 F.3d 475, 482 (5th Cir.2000); *GTE South, Inc. v. Morrison*, 199 F.3d 733, 745 (4th Cir.1999); *US West Communications v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1117 (9th Cir.1999).

A party is entitled to summary judgment if "the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). " 'Where cross-motions for summary judgment are filed, a court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.' " *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 88 (2d Cir.2003) (quoting *Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir.2002) (internal quotation marks omitted)).

### B. Local Calling Areas (Issue 3)

In 1995 and 1997 the Public Service Board established the boundaries of local calling areas for the ILEC. *See Petition of Global NAPs, Inc. for Arbitration*, Docket

---

7. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

No. 6742 (Vt.Pub.Serv.Bd. Dec. 26, 2002) at 12 & n. 31 ("PSB Order") (Doc. 18, App. Tab 1). In a 1999 order, the Board ruled that CLECs are free to define their own local calling areas for purposes of billing their retail customers, but the local calling areas established by the Board for the ILEC govern intercarrier compensation, i.e., whether the call is subject to reciprocal compensation or access charges. *See Investigation into New England Tel. & Tel. Co.'s (NET's) Tariff Filing*, Docket No. 5713 (Vt.Pub.Serv.Bd. Feb. 4, 1999) at 114 (rates for compensation among carriers will be based upon local calling areas set out in Docket 5670); *see also* PSB Order at 12 & n. 32. In the arbitration proceedings, the parties sought a determination whether the Public Service Board ruling should be modified to provide that the distinction between toll and local traffic for purposes of intercarrier compensation would be defined by the local calling area of the company that originates the call. The Board declined to modify its 1999 ruling, concluding that "intercarrier compensation shall continue to be based on the local calling areas established in Docket 5670." PSB Order at 41.

Global contends that the Order violates 47 C.F.R. § 51.701(b)(1), which defines telecommunications traffic, for purposes of reciprocal compensation, as "telecommunications traffic exchanged between a LEC and a telecommunications carrier ..., except for telecommunications traffic that is interstate or intrastate exchange access, information access, or exchange services for such access." 47 C.F.R. § 51.701(b)(1). Global reasons that if reciprocal compensation applies to all telecommunications traffic except exchange access, information access, and exchange services; and if exchange access is defined as the provision of access to facilities for the purpose of the origination or termination of telephone toll services; and if telephone toll service is defined as "telephone service between sta-

tions in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service," 47 U.S.C.A. § 153(48); then traffic is only subject to access charges when the originating customer's carrier levies a separate toll charge. Therefore, it argues, the Public Service Board's Order contravenes federal regulations by imposing access charges on traffic originated by Global's customers that crosses Verizon's local calling area boundaries, regardless of whether Global regards the call as local or toll for purposes of billing its customers.

Under Global's interpretation, a call from a Global customer in Vermont to anywhere in the world would not be telephone toll service for purposes of intercarrier compensation if Global offered the customer unlimited worldwide calling for a flat fee. Setting aside the question whether Global does now or ever intends to offer local calling service in Vermont, the FCC in its Remand Order specifically stated that prior to the enactment of the 1996 Act, the FCC and the states had in place regimes applicable to access services—services that provide connection to points beyond the local exchange—that Congress did not intend to disrupt when it created reciprocal compensation requirements. Remand Order at 9168 ¶ 37. According to the FCC, the reciprocal compensation requirements of the 1996 Act exclude traffic already subject to interstate and intrastate access regulations. *Id.* & n. 66.

> The FCC has also made clear that state commissions have the authority to determine what geographic areas should be considered "local areas" for the purpose of applying reciprocal compensation obligations under section 251(b)(5), consistent with the state commissions' historical practice of defining local service areas for wireline LECs.... We expect the states to determine whether

intrastate transport and termination of traffic between competing LECs, where a portion of their local service areas are not the same, should be governed by section 251(b)(5)'s reciprocal compensation obligations or whether intrastate access charges should apply to the portions of their local service areas that are different.

*Implementation of the Local Competition Provisions in the Telecomms. Act of 1996,* 1996 WL 452885, 11 F.C.C.R. 15,499, 16,013–14 ¶ 1035 (Aug. 8, 1996) ("First Report & Order"), *aff'd in part, vacated in part, Competitive Telecomms. Ass'n v. FCC,* 117 F.3d 1068 (8th Cir.1997), *and aff'd in part, vacated in part, Iowa Utils. Bd. v. FCC,* 120 F.3d 753 (8th Cir.1997), *aff'd in part, rev'd in part, AT & T Corp. v. Iowa Utils. Bd.,* 525 U.S. at 397, 119 S.Ct. 721. In a recent arbitration in Virginia, the FCC reiterated that "state commissions have authority to determine whether calls passing between LECs should be subject to access charges or reciprocal compensation for those areas where the LECs' service areas do not overlap," and it declined to disturb the existing distinction in that state. *Petition of WorldCom, Inc.,* 2002 WL 1576912, 17 F.C.C.R. 27,039, 27,307 ¶ 549 (July 17, 2002) (mem. op. & order).

■ The historical practice of allowing state commissions to define local service areas was not altered by the FCC's ruling in its Initial and Remand Orders that ISP-bound traffic was inherently interstate in character. Although carriers in Vermont as elsewhere who operate under interconnection agreements made after the effective date of the Remand Order must exchange ISP-bound traffic on a bill-and-keep basis, the Remand Order did not otherwise disrupt the state commissions' ability to define local service areas. Global's contention that the Remand Order and its attendant regulations require the Board to cede its authority to define local calling areas to Global is unfounded.

## C. *Prohibition of VNXX Service (Issue 4)*

Before the Public Service Board Verizon sought a ruling that it need not pay reciprocal compensation for traffic that only appeared to be local by virtue of the VNXX, but was actually interexchange traffic. The Board ruled that the determination of whether traffic is "local" or "toll" is based upon the physical termination points of the calls, not the rate center designated by the carrier, PSB Order at 42, and it banned Global's use of VNXX in Vermont. *Id.* at 45.

■ Global argues first that the Public Service Board lacked the authority to ban the use of VNXX service because neither party to the arbitration raised the issue of the right to use VNXX service. The 1996 Act requires a state commission that is arbitrating issues concerning an interconnection agreement to limit its consideration to the open or unresolved issues presented by the petition for arbitration and any response thereto. 47 U.S.C.A. § 252(b)(4)(A). Neither Global nor Verizon objected to the use of VNXX; Verizon wanted only to ensure that it need not pay reciprocal compensation for VNXX traffic. Global, however, squarely raised the issue of its right to use VNXX in its petition for arbitration. Global's caption describing Issue 4 to the Board stated: "Can Global assign to its customers NXX codes that are 'homed' in a central office switch outside of the local calling area in which the customer resides?" *See* PSB Order at 10; Cross–Mot. of Bd. Member Defs. at 3 (Doc. 20). Global proceeded to present arguments for the use of VNXX service. Global did in fact raise the issue of its right to use VNXX. That it and Verizon were amenable to different solutions than the one the Board adopted did not deprive the Board of the authority to address the issue, once Global raised it.

Global also contends that the Board's Order unlawfully discriminates against VNXX traffic. Verizon offers its customers Foreign Exchange ("FX") service, which Global argues is functionally identical to VNXX, and therefore must be treated identically. Customers using FX service purchase an FX line, a link between two central offices, or switches. They pay costs that cover the cost of the line and the transportation of traffic in bulk between the two points. Calls placed to the line are considered terminated at that end, even though the calls are transported to the other end of the line and ordinarily would incur toll charges. *See* PSB Order at 21. FX service thus allows what would be a toll call to be treated as a local call, even though the call actually terminates at a point outside the customer's local calling area. In that respect FX service functions the same as VNXX service from the point of view of the retail customer.

From the carriers' and regulators' points of view, however, the services operate quite differently. When VNXX numbers are assigned, neither Global nor its customers purchase any equipment, nor do they pay for the costs of transporting the call. Instead Global relies on Verizon, the ILEC, to transport the calls, in accordance with Verizon's obligation to provide interconnecting services. Global does not dispute the distinction, but considers it irrelevant.

■ The 1996 Act requires that Verizon and Global interconnect "on rates, terms, and conditions that are just, reasonable and nondiscriminatory." 47 U.S.C.A. § 251(c)(2). The Public Service Board must ensure that an arbitrated interconnection agreement meets the requirements of section 251. *Id.* § 252(c)(1). Because FX and VNXX are not equivalent services, the Board's order, which allows any LEC that so chooses to provide FX service, but does not permit VNXX service, does not discriminate against Global in violation of § 252(c)(1).

■ Global next argues that the Public Service Board does not have jurisdiction to ban Global's use of VNXX to provide information access services because ISP-bound traffic is interstate in character and therefore subject exclusively to FCC authority. *See* Remand Order at 9154 ¶ 4; 9189 ¶ 82. The Remand Order made no such sweeping preemptive claim. It expressly stated that access services remain subject to FCC jurisdiction "or, to the extent they are intrastate services, they remain subject to the jurisdiction of state commissions." *Id.* at ·9169 ¶ 39. It also acknowledged that ISP-bound traffic has interstate and intrastate components that cannot be reliably separated. *Id.* at 9175 ¶ 52; *see also La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 360, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (in practice, dual federal and state regulation over telephone service does not divide neatly into separate interstate and intrastate domains). The FCC stated that the Remand Order "does not preempt any state commission decision regarding compensation for ISP-bound traffic for the period prior to the effective date of the interim regime we adopt here." Remand Order at 9189 ¶ 82. Moreover, state commissions' power to arbitrate interconnection agreements, including those that involve ISP-bound traffic, has not altered because the FCC has issued rulings that govern intercarrier compensation for ISP-bound traffic. *See AT & T Corp. v. Iowa Utils. Bd.,* 525 U.S. at 385, 119 S.Ct. 721 (1996 Act entrusts state commissions with job of approving interconnection agreements, even though FCC promulgates rules to guide state commission judgments).

Although Global characterizes the Board's Order as "determin[ing] who can or cannot serve ISPs," Global's Mem. in

**300**

Supp. at 13 (Doc. 13), the Board did not bar Global from providing service to ISPs. It merely ruled that Global could not obtain an unfair advantage in the market by offering VNXX service with Verizon footing the bill.

Global also argues that federal law prohibits the Board from imposing intrastate access charges on ISP-bound traffic. In its Remand Order, the FCC ruled that as of the Order's effective date carriers entering into new interconnection agreements "shall exchange ISP-bound traffic on a bill-and-keep basis during this interim period." Remand Order at 9188 ¶ 81. Explaining its reasoning, the FCC stated, "we believe that a standstill on any expansion of the old compensation regime into new markets is the more appropriate interim answer." *Id.* at 9189 ¶ 81.

With the Remand Order the FCC preempted state commissions' authority to deal with intercarrier compensation for ISP-bound traffic. *Id.* at 9189 ¶ 82 ("Because we now exercise our authority under section 201 to determine the appropriate intercarrier compensation for ISP-bound traffic, ... state commissions will no longer have authority to address this issue."). The FCC did not distinguish traffic between an ISP and its customer in different local calling areas from traffic between an ISP and its customer in the same local calling area. Intercarrier compensation for ISP-bound traffic, regardless of the physical location of the ISP, is governed exclusively by the FCC. For existing compensation regimes, intercarrier compensation is at most $.0007/mou.[8] For interconnection agreements entered into after June 14, 2001, such as the one at issue here, cost recovery is on a bill and keep basis. *Id.* at 9188 ¶ 81.

In the arbitration proceeding, the parties contested whether each party should be responsible for the costs associated with transporting telecommunications traffic to their point of interconnection ("POI"). The Public Service Board's Hearing Officer recommended that each party should be responsible for its own costs of delivery to the POI, and noted that according to the FCC there should be no payment made to Verizon to transport Global's ISP-bound traffic. PSB Order at 8–9. The Board accepted the Hearing Officer's recommendation, and ruled that each party would be required to transport traffic on its side of the POI at its own expense. *Id.* at 40. In the course of its discussion however, the Board opined that intrastate toll traffic, whatever its destination, was unaffected by the FCC's Remand Order, and that access charges would continue to apply to such traffic. *Id.* at 39.

■ To the extent that the Public Service Board ruled that access charges apply to ISP-bound traffic, its ruling is at odds with the FCC's ruling in the Remand Order. Global did not appeal the Board's ruling on this issue, however. Global's somewhat disjointed contention is that the Board's prohibition of VNXX violates the Remand Order by enabling it to impose access charges on ISP-bound traffic. Although the Board is precluded from imposing access charges on ISP-bound traffic, it is not precluded from banning VNXX.

Finally, Global argues that the filed rate doctrine prohibits the Board from interfering with Global's federally tariffed service to its ISP customers by banning VNXX service. Global did not argue to the Board that the filed rate doctrine prohibits it from barring VNXX service because the service is provided pursuant to a federal tariff; thus the argument is waived. *See Zatz v. United States*, 149 F.3d 144, 146 (2d Cir.1998) (by failing to present juris-

8. "mou" refers to "minute-of-use." *See, e.g.,* Remand Order at 9156 ¶ 8.

dictional argument to agency, petitioners waived right to present it to federal court; defect in agency's jurisdiction does not affect subject matter jurisdiction of district court). Even were the Court to consider Global's argument, however, the argument fails.

 Section 203(a) of Title 47 requires every common carrier to file with the FCC "schedules showing all charges for itself and its connecting carriers . . . and showing the classifications, practices, and regulations affecting such charges." 47 U.S.C.A. § 203(a). No carrier may "extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule." *Id.* § 203(c). The purpose of the filed rate doctrine provisions is to prevent unreasonable and discriminatory charges. *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.,* 524 U.S. 214, 221–22, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998); *see also Fax Telecommunicaciones Inc. v. AT & T,* 138 F.3d 479, 488 (2d Cir.1998) (filed rate doctrine is central to regulatory scheme for interstate telecommunications carriers). Rates filed with the FCC have the force of federal law, and completely set forth the rights and liabilities between carrier and customer. *ICOM Holding, Inc. v. MCI Worldcom, Inc.,* 238 F.3d 219, 221 (2d Cir.2001); *AT & T Co. v. Cent. Office,* 524 U.S. at 227, 118 S.Ct. 1956.

 Two principles underlie the filed rate doctrine: "(1) preventing carriers from engaging in price discrimination as between ratepayers (the 'nondiscrimination strand') and (2) preserving the exclusive role of federal agencies in approving rates for telecommunications services that are 'reasonable' by keeping courts out of the rate-making process (the 'nonjusticiability strand'), a function that the federal regulatory agencies are more competent to perform." *Marcus v. AT & T Corp.,* 138 F.3d 46, 58 (2d Cir.1998) (citing *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 19 (2d Cir.1994)); *accord Fax Telecommunicaciones,* 138 F.3d at 489. The filed rate doctrine applies not only to rates or charges, but also to non-price aspects of telecommunications services, such as special services or billing options. *ICOM,* 238 F.3d at 222; *see also AT & T Co. v. Cent. Office,* 524 U.S. at 224–25, 118 S.Ct. 1956.

 The Board's prohibition of VNXX service offends neither the "nondiscrimination strand" nor the "nonjusticiability strand" of the filed rate doctrine. The ban does not have the effect of discriminating, or requiring Global to discriminate, among Global's customers; it simply does not permit Global to offer the service to any of its customers. A ban on VNXX service likewise does not involve the Board or this Court in any determination of whether the rates or terms of the service are reasonable. The Board's ban has not varied the rates or terms of Global's tariff, nor has it attempted to create or enforce obligations between Global and its customers that do not appear in the federal tariff. The filed rate doctrine does not prevent the Public Service Board from prohibiting the use of VNXX within Vermont.

### III. *Conclusion*

The Public Service Board's determination that intercarrier compensation shall continue to be based on the local calling areas as established in previous Board proceedings does not violate federal law. The Board's ban on Global's use of VNXX likewise does not violate federal law. Global's motion for summary judgment is denied; Verizon's cross-motion for summary judgment is granted; the individual Board members' cross-motion is denied as moot.