# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 12, 2004          Decided January 14, 2005

No. 03-1431

AT&T CORPORATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

On Petition for Review of an Order of the
Federal Communications Commission

*David W. Carpenter* argued the cause for petitioner. With him on the briefs were *Peter H. Jacoby*, *James F. Bendernagel, Jr.*, *C. John Buresh*, and *Michael J. Hunseder*.

*Laurence N. Bourne*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the briefs were *Robert B. Nicholson* and *Steven J. Mintz*, Attorneys, U.S. Department of Justice, *John A. Rogovin*, General Counsel, *Richard K. Welch*, Associate General Counsel, *John E. Ingle*, Deputy Associate General Counsel, and *Rodger D. Citron*, Counsel. *Laurel R. Bergold*, Counsel, entered an appearance.

Before: GINSBURG, *Chief Judge*, and TATEL and ROBERTS, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: AT&T Corporation petitions for review of a Federal Communications Commission order interpreting AT&T's tariff on resales of 800 telephone service. A provision of that tariff allows resellers to transfer their business, so long as the recipient assumes all of the transferor's obligations. Based on this provision, AT&T denied one reseller's request to move the "traffic" under its 800 plans to another reseller without a transfer of the corresponding obligations. The Commission interpreted the tariff transfer provision as not addressing the movement of traffic, and ultimately held that AT&T could not refuse the transfer. We conclude that traffic is a type of service covered by the transfer provision, and that the Commission's contrary interpretation would render the provision meaningless. We grant the petition for review.

## I.

This case concerns the transfer of toll-free 800 telephone service. At the time of the events in question, AT&T was the dominant carrier of such service, which it provided pursuant to tariffs filed with the FCC. Under the Communications Act of 1934, as amended, and the "filed rate doctrine" incorporated therein, neither the carrier nor its customers could depart from the terms set forth in AT&T's tariffs. *See* 47 U.S.C. § 203(c); *AT&T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 221–24 (1998); *Orloff v. FCC*, 352 F.3d 415, 418 (D.C. Cir. 2003).

The tariff at issue here — AT&T Tariff FCC No. 2 — allowed companies to purchase and resell 800 service to small businesses around the country. The tariff refers to this resale business, as well as the underlying service itself, as Wide Area Telecommunications Service (WATS). Any company could

qualify as a reseller so long as it met the requirements of one of several plans described in the tariff. Companies qualified by aggregating the WATS usage of multiple small businesses into a single plan, and, under the tariff, the companies obtained AT&T's service for these "end-user" businesses at a discounted rate. In return, the reseller or "aggregator" company agreed to meet certain obligations set forth by the carrier, including commitments to purchase a certain volume of use.

In the early 1990s, as other carriers began to acquire a share of the 800 market, the FCC began to loosen its regulation of AT&T. Starting in 1991, the Commission no longer forced the carrier to offer WATS only through the generic plans set forth in Tariff No. 2. Instead, the FCC gave AT&T the option of individually negotiating "contract tariffs" with particular resale companies. As contract tariffs could be drawn to offer discounts greater than those available under Tariff No. 2, many resellers naturally sought to obtain them.

Alfonse Inga, a New Jersey businessman who owned several aggregator companies, was one such reseller. In 1994, Mr. Inga undertook a series of transactions designed to move his business from Tariff No. 2 to a more lucrative contract tariff. First, his companies — each of which operated under CSTP II, a type of plan offered under Tariff No. 2 — transferred all nine of their plans to a new entity, Combined Companies, Incorporated (CCI). As required by Section 2.1.8 of Tariff No. 2, CCI expressly agreed to assume all obligations of the transferor companies. The transfer also stipulated that CCI would pass 80 percent of its profits on to the transferor companies. Second, CCI attempted to negotiate a contract tariff with AT&T. Third, as temporary cover until this envisioned contract tariff became a reality, or as a permanent alternative in case it never did, Mr. Inga planned another transfer — one between CCI and Public Services Enterprises of Pennsylvania (PSE). PSE already had a contract

tariff with AT&T at a substantially larger discount on AT&T's 800 service than that available to CCI under Tariff No. 2.

AT&T resisted this series of transactions. Fearing that CCI would not have the assets to meet its obligations under the transferred plans, AT&T initially refused to implement the first transfer (from the Inga companies to CCI) unless CCI paid a deposit — a requirement not found in Section 2.1.8 of Tariff No. 2. In 1995, the Inga companies and CCI brought suit against AT&T in federal district court in New Jersey, and the court ordered AT&T to drop the deposit requirement and implement the transfer. *Combined Companies, Inc. v. AT&T*, No. 95–908 (D.N.J. May 19, 1995) (unpublished opinion).

Meanwhile, CCI's negotiations for its own contract tariff failed and CCI entered into the second transfer, moving substantially all the 800 service in its CSTP II plans to PSE. As with the first transfer, the CCI-PSE agreement called for PSE to pass much of the realized profit back to CCI. The second transfer, however, differed from the first in an important respect. The parties attempted to structure the transaction to avoid Section 2.1.8 of Tariff No. 2, so that PSE would not have to assume CCI's obligations on the transferred service. To do this, the parties asked AT&T to move just the service to particular end-user businesses — the "traffic" under CCI's plans — and to leave the plans themselves otherwise intact. The parties hoped that, as a result, 800 service would be billed under PSE's substantially lower contract tariff rates, while CCI would remain responsible for the obligations to the carrier under Tariff No. 2.

AT&T balked at this second transfer as well. AT&T maintained that Section 2.1.8 applied to the transaction, and that PSE thus had to assume CCI's obligations in order for the transfer to go through. In addition, AT&T argued that the proposed transfer violated the tariff's "fraudulent use" provisions, as CCI almost certainly would fall short of its volume

commitments once the traffic was moved to PSE's account, and AT&T had reason to believe that CCI would not have sufficient assets to pay the resulting penalties.

The same district court that compelled AT&T to accept the first transfer declined to rule on the second, holding that tariff interpretation issues were within the primary jurisdiction of the FCC. *Id.* at \*15. When none of the parties brought the primary jurisdiction matter to the agency, however, the district court went ahead and issued its own decision interpreting the tariff. *See Combined Companies, Inc. v. AT&T*, No. 95–908 (D.N.J. Mar. 5, 1996) (unpublished opinion). The Third Circuit vacated this ruling as inconsistent with the primary jurisdiction referral, and ordered the sides to bring the matter to the FCC's attention. *Combined Companies, Inc. v. AT&T*, No. 96–5185 (3d Cir. May 31, 1996) (unpublished opinion).

The specific question referred to the FCC was "whether section 2.1.8 permits an aggregator to transfer traffic under a plan without transferring the plan itself in the same transaction." *Id.* at \*3. While the case was pending before the Commission, AT&T entered into a settlement with CCI, extinguishing its WATS plans and releasing all claims between the two parties. Apparently as a result of this settlement, the Commission took no action on the case for seven years. The Inga companies, however, continued to claim damages stemming from AT&T's denial of the CCI-PSE transfer, and in 2003 the Commission finally addressed the Third Circuit referral.

The Commission held that Section 2.1.8 did not govern, and therefore did not preclude, the movement of traffic without attendant obligations. FCC Memorandum Opinion and Order at 6–8. In particular, the Commission reasoned that Section 2.1.8 applied only to the transfer of entire tariffed plans, and not to the transfer of just the traffic component of such plans. *Id.* at 7. The Commission also held that, even assuming the transaction

constituted fraud under the tariff, the tariff did not allow AT&T to remedy such fraud by denying the transfer. *Id.* at 8–10. In light of these holdings, the Commission ruled that AT&T could not refuse the CCI-PSE transfer. *Id.* at 14. The Inga companies, whose involvement in the federal district court action in New Jersey is still ongoing, view the Commission's ruling as entitling them to millions of dollars in damages.

AT&T now petitions for review of the FCC order.

## II.

Our inquiry is governed by the Administrative Procedure Act, which requires us to uphold an FCC order unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To clear this threshold, the FCC's tariff interpretations must be "reasonable [and] based upon factors within the Commission's expertise." *Global NAPS, Inc. v. FCC*, 247 F.3d 252, 258 (D.C. Cir. 2001) (citation omitted and alteration in original). Thus, we will reverse the FCC only if its interpretations are "not supported by substantial evidence, or the [Commission] has made a clear error in judgment." *Id.* (same).

The Commission's order in this case is entirely predicated on its determination that Section 2.1.8 of Tariff No. 2 does not apply to the movement of traffic. At the time of the proposed transfer to PSE, that Section read as follows:

> Transfer or Assignment — WATS [Wide Area Telecommunications Service] . . . may be transferred or assigned to a new Customer, provided that:
>
> . . .
>
> B. The new Customer notifies [AT&T] in writing that it agrees to assume all obligations of the former Customer at the time of the transfer or assignment.

The Section on its face does not differentiate between transfers of entire plans and transfers of traffic, but rather speaks only in terms of WATS — the telephone service itself. The new and former Customers referred to are the aggregators, in this case PSE and CCI. Accordingly, any transfer of WATS required PSE to assume CCI's obligations.

AT&T's basic argument before this court is that "traffic," even if it is not the same thing as a tariffed *plan*, is a type of Wide Area Telecommunications *Service* covered by Section 2.1.8. In transferring traffic, the parties sought to reassign particular end-user businesses from CCI to PSE, so that calls to these businesses would be billed under PSE's lower rates. Thus, CCI asked AT&T to transfer the billed telephone numbers (corresponding to individual end-user locations) included in each CSTP II plan. *See* Transfer of Service Agreement Forms. It must be — AT&T argues — that what the parties sought to transfer is a type of service covered by the tariff; that is why they used the Transfer of *Service* forms. *See* AT&T Tariff FCC No. 2, Section 3.1.1 (defining "800 Service and WATS" as "telecommunications services which permit inward and outward calling respectively between a station associated with an access line in one location and stations in diverse geographical service areas specified by the Customer").

The Commission does not respond directly to AT&T's argument. Instead, both in its brief before this court and in its order below, the FCC relies on a statement made by AT&T in comments submitted in the administrative proceeding. There, AT&T noted in passing that "in this case the relevant WATS services are the CSTP II Plans." Comments of AT&T Corp. in Opposition to Joint Petition for Declaratory Ruling and Joint Motion for Expedited Consideration at 10. The Commission interprets this statement as conceding that Section 2.1.8 can only be triggered by the wholesale transfer of tariffed plans, and not

by the transfer of component parts such as individual billed telephone numbers.  *See* FCC Order at 6–7; FCC Br. at 16–18.

AT&T, however, argues persuasively that the FCC misinterpreted its comment.  Immediately following the alleged concession, AT&T's submission noted that:

> [Section 2.1.8], by its terms, allows a transfer of CCI's service to PSE only if PSE agreed to assume all obligations under those plans.  *Yet CCI explicitly amended the transfer of services form to read "Traffic Only."*  By expressly declaring that it did not intend to effectuate a transfer of all obligations under the plans to PSE . . . *the proposed transfer, on its face, violated the terms of Section 2.1.8.*

Comments of AT&T Corp. at 10–11 (emphasis added) (citation omitted).  It appears quite clear, then, that AT&T did not concede the inapplicability of Section 2.1.8 to transfers of traffic only.  Indeed, had AT&T been willing to make such a concession, it presumably would not have contested the meaning of this provision before the Commission.  Accordingly, the FCC's reliance on AT&T's comment is plainly misplaced.

Absent such reliance, the Commission provides us with little reason why the plain language of Section 2.1.8 fails to encompass transfers of traffic alone.  The Commission maintains that "[r]ather than a single transfer request, here CCI and PSE effectively made two requests: one by CCI to AT&T to decrease its traffic, and another by PSE to increase its traffic."  FCC Order at 7; *see* FCC Br. at 17.  But this hardly sheds light on the meaning of the transfer provision.  First, AT&T contends that a simultaneous decrease and increase in the respective service of CCI and PSE would in fact not accomplish the same objectives as a transfer of service.  AT&T argues that the transfer provision, Section 2.1.8, was included precisely because there are practical benefits to a transfer that would be lost through a transaction of the sort hypothesized by the Commission.  These include

guarantees against service interruptions and the loss of particular 800 numbers, as well as exemption from a requirement that resellers obtain their end-users' written consent prior to the transaction. *See* AT&T Br. at 21–23.

Be that as it may, proceeding by analogy does not change the fact that CCI and PSE did request a *transfer* — a transaction on its face at least potentially within the reach of Section 2.1.8, which governs "Transfer or Assignment" — instead of dropping and adding traffic in separate transactions. George Eliot has written that "the world is full of hopeful analogies," MIDDLEMARCH 83 (Penguin Classics 1994) (1872), and this must be one of them, but likening the transfer at issue to a different arrangement, and then analyzing how *that* arrangement would fare under Section 2.1.8, does not advance the FCC's position very far.

In addition, the Commission's failure to grasp AT&T's comment reveals a more fundamental error in its approach. The reason AT&T seemed to equate the transfers in this case with a transfer of plans is that CCI sought to move *virtually all* of the billed telephone numbers in each of its CSTP II plans. Thus, for each of the nine plans, CCI asked AT&T to move all but one, or all but two, of the telephone numbers included in that plan. *See* Transfer of Service Agreement Forms. In so doing, CCI asked AT&T to move nearly all the services — all the benefits — associated with its CSTP II plans. What was left behind were CCI's obligations — the burdens under the plans. Accordingly, even if small scale transfers of traffic were outside the scope of Section 2.1.8, allowing *this* transaction to go through would create an obvious end-run around the unquestioned rule that new Customers had to "assume all obligations" in transferring WATS *plans*. Any reseller could circumvent Section 2.1.8 simply by asking AT&T to move its business one billed telephone number at a time. Using such a scheme, a reseller could move every component of a plan, save its obligations to AT&T. The transfer

provision would then have no effect except in those cases where the transferor foolishly fell within its scope by phrasing its request in terms of the tariffed plans themselves.

The FCC itself recognized that the "purpose" of Section 2.1.8 "was to maintain intact the balance of obligations and benefits between parties under the tariff when one customer stepped into the shoes of another." FCC Order at 7. The Commission's interpretation eviscerates this very purpose, allowing PSE to take up essentially all of CCI's resale business without assuming so much as one of CCI's obligations to AT&T.[1]

As the foregoing discussion indicates, we find the Commission's interpretation implausible on its face. First, the plain language of Section 2.1.8 encompasses all transfers of WATS, and not just transfers of entire plans. In the absence of any contrary evidence, we find that "traffic" is a type of service covered by the tariff. Second, the FCC's interpretation, permitting the movement of benefits without any assumption of obligations, would render the transfer provision meaningless

---

[1] The FCC contends that this entire line of argument — challenging the Commission's interpretation as rendering Section 2.1.8 meaningless — is not properly before us, as AT&T did not first present it to the Commission in a petition for reconsideration. FCC Br. at 15 & 19. We disagree. The Communications Act precludes us from addressing only those issues upon which the Commission "has been afforded no opportunity to pass." 47 U.S.C. § 405(a). It does not prevent us from considering "whether the original question was correctly decided," *MCI v. FCC*, 10 F.3d 842, 845 (D.C. Cir. 1993), or whether the FCC "relied on faulty logic." *Nat'l Ass'n for Better Broadcasting v. FCC*, 830 F.2d 270, 275 (D.C. Cir. 1987). The analysis recounted above speaks to the soundness of the Commission's ruling on the question initially presented, and not to any novel legal or factual claims.

even in cases involving the transfer of entire plans, so long as the parties asked the carrier to move all the beneficial plan components rather than the plan itself. The whole purpose of the tariff provision in question was to ensure that benefits could not be transferred without concomitant obligations. It is utterly untenable to contend that the provision does not apply when only benefits are transferred.

In sum, the FCC clearly erred in ruling that Section 2.1.8 of AT&T Tariff FCC No. 2 does not apply to a transfer of "traffic." As this was a threshold determination in the FCC's order, we do not reach the remaining issues addressed by the Commission and argued by the parties before us. We also do not decide precisely which obligations should have been transferred in this case, as this question was neither addressed by the Commission nor adequately presented to us.[2] All we decide is that Section 2.1.8 cannot be read to allow parties to transfer the benefits associated with 800 service without assuming any obligations. The petition for review is granted.

---

[2] At oral argument, AT&T's counsel repeatedly stated that Tariff No. 2 expressly required PSE to assume the volume commitments that form the heart of AT&T's concern in this case. *See* Transcript of Oral Argument at 11, 13. In a motion submitted after the argument, however, the Inga companies note that the only obligations enumerated by Section 2.1.8 are "outstanding indebtedness for the service" and "the unexpired portion of any applicable minimum payment period." Intervenors Motion to Clarify and Correct the Facts of the Record at 4. How this enumeration affects the requirement that new customers assume "*all* obligations of the former Customer" (emphasis added) is beyond the scope of our opinion.